**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| ROSS WEINTRAUB<br>Lafayette Hill, PA 19444, derivatively on behalf<br>of INNOVATIVE INDUSTRIAL<br>PROPERTIES, INC.<br>　　　　　　　Plaintiff,<br><br>　　　v.<br><br>ALAN D. GOLD<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>PAUL SMITHERS<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>CATHERINE HASTINGS<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>BEN REGIN<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>ANDY BUI<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>TRACIE HAGER<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>GARY A. KREITZER<br>89 Center Drive, Suite 200<br>Park City, Utah 84098<br><br>DAVID STECHER<br>89 Center Drive, Suite 200<br>Park City, Utah 84098 | Civil Action No.:<br><br><br>**JURY TRIAL DEMANDED** |

SCOTT SHOEMAKER, M.D.
89 Center Drive, Suite 200
Park City, Utah 84098

MARY CURRAN
89 Center Drive, Suite 200
Park City, Utah 84098

                 Defendants,

      -and-

INNOVATIVE INDUSTRIAL PROPERTIES,
INC.,
c/o Res. Agt. Cogency Global, Inc.
1519 York Rd.
Suite 201
Lutherville, MD 21093

              Nominal Defendant.

Plaintiff Ross Weintraub ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant Innovative Industrial Properties, Inc. ("IIPR" or the "Company"), submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsels' investigation, which included, *inter alia*, review and analysis of: (i) regulatory filings made by IIPR with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by IIPR; (iii) a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey captioned *Mallozzi v. Innovative Industrial Properties, Inc. et al.,* Case No. 2:22-cv-02359-EP-JRA (the "Securities Action") alleging issuance of false and misleading statements of material fact, and the alleged omission to state material facts necessary to make other statements made not misleading,

between August 7, 2020 through August 4, 2022 (the "Relevant Period") with respect to IIPR's business, operations, and prospects; and (iv) other publicly available information, including media and analyst reports, concerning IIPR.

## NATURE OF THE ACTION AND OVERVIEW

1.       This is a stockholder derivative action asserting claims for breach of fiduciary duty and other violations of law brought on behalf of nominal defendant IIPR against certain officers and members of the Company's Board of Directors (the "Board").

2.       IIPR portrays itself as a self-advised corporation focused on the acquisition, ownership and management of specialized properties leased to experienced, state-licensed operators for their regulated medical-use cannabis facilities. IIPR delivers returns by collecting rent payments from its tenants/operators ("operators"), and as a result, relies upon operators to run their facilities profitably and in compliance with the law.

3.       Because marijuana is not legal under federal law, it is hard for marijuana growers to receive bank loans. IIPR saw the opportunity in this, buying land from operators at prices far higher than the growers themselves had paid for the property, with the excess sales price (sometimes 300% higher than the actual value of the property) extended back to the operator to invest and buy the necessary equipment to successfully farm and sell marijuana. Because of the newness of the market and the lack of available traditional financing sources, IIPR was able to charge high interest rates on its loans.

4.       Since finding a replacement operator to run a functioning marijuana facility would be extremely difficult, and likely involve lowered rents due from the replacement operators, IIPR told investors that it had always performed extensive background checks on its prospective operators. For example, during an August 5, 2021, earnings conference call ("Q2 2021 call"),

Executive Chairman of the Board Alan D. Gold ("Gold") told investors that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations …."

5.     Kings Garden Inc. ("Kings Garden") is one of IIPR's largest operator and is managed by its Founder, Chairman and CEO Michael King ("King"). In 2019 IIPR entered into sale leaseback transactions for properties with Kings Garden.

6.     IIPR bought five fully operational facilities located in California from Kings Garden at prices far higher than Kings Garden had paid for the properties, and immediately leased them back to Kings Garden on triple-net leases. As with all of IIPR's sale-leaseback or third-party transactions, Kings Garden was responsible for all aspects of upgrading the facility, and growing and selling the cannabis. IIPR's interest was in collecting rents from Kings Garden, and earning interest on loans it made available to Kings Garden. As a result of the Kings Garden purchases, Kings Garden became IIPR's third largest operator.

7.     Throughout the Relevant Period, IIPR stated that its management did in-depth investigations on potential tenants/operators. For example, in the risk warning section of the 2019 10-K, IIPR warned that "the success of our investments will be materially dependent on the financial stability of these tenants. We rely on our management team to perform due diligence investigations of our potential tenants…." Additionally, IIPR made public representations that lauded its relationship with Kings Garden, and King personally.

8.     On April 14, 2022, before the market opened, short seller Blue Orca Capital ("Blue Orca") released a report (the "Report") detailing that King had a background filled with fraud and theft allegations, name changes, and litigation, and that this information was available from early

2019, before IIPR ever contracted with Kings Garden. Further, the Report detailed that IIPR had purchased properties at far higher prices than the sellers they entered into sale-leaseback transactions had paid for the properties, and that by recording the fair value of the properties as the purchase price, IIPR was hiding its true financial condition by overvaluing its assets.

9.      "In the last 18 months, we think IIPR's loan book appears to have degraded significantly as the sector has become more competitive and IIPR stretched for lower quality tenants in search of continuing growth. IIPR's largest tenant is a failed SPAC that appears in severe financial distress and was recently sued by investors accusing it of securities fraud and being in effect a Ponzi scheme," noted the Report, adding that "unlike other REITs, IIPR cannot expect to recover the lost income from defaulting tenants because it appears that the actual values of its properties are substantially below their carrying value on IIPR's balance sheet. IIPR's stock has already priced in robust net income growth in FY 2022, meaning a repricing is likely given the risk of default at its primary tenant level and the deteriorating fundamentals of other IIPR portfolio companies."

10.      According to the Report, "IIPR's second-largest tenant is Kings Garden, a private California cannabis company, which was sued by its co-founder in 2021, alleging unlawful and fraudulent conduct. Notably, the lawsuit accused Kings Garden of falsifying books and records and of selling substantial quantities of illegal cannabis on the black market and that based on the price paid by Kings Garden before flipping them to IIPR, "we estimate that the residual value of the properties is a fraction of the carrying value of the properties on IIPR's balance sheet…."

11.      That same day, IIPR stated in a Company press release that it was "aware of a short-seller report (...) that contains numerous false and misleading statements about IIP." "This short-seller report is flawed and demonstrates a basic lack of understanding of commercial real estate

generally, the regulated cannabis industry, and IIP's straightforward, simple business model."

12.      IIPR continued its support of King and Kings Garden during IIPR's May 5, 2022 earnings conference call, with Gold stating that "[w]e have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency in perhaps the single largest cannabis market in the world." In the context of the California state and local regulatory environment, Gold continued, "we believe Kings Garden has navigated this environment well. And our firm believe[s] that high-quality producers like Kings Garden will continue to effectively adapt to the changing landscape in California."

13.      On July 14, 2022, after the market closed, in direct contrast to the assurances IIPR gave to investors, IIPR announced that Kings Garden had failed to pay its July 2022 rent under any of its leases.

14.      On July 25, 2022, the full truth emerged when IIPR filed a civil lawsuit against Kings Garden, King, and related parties, alleging fraud, theft, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").[1] In that lawsuit, IIPR acknowledged it never did a thorough investigation of Kings Garden or King. In fact, IIPR did not even do a rudimentary background check on King. This is demonstrated by the fact that the lawsuit revealed that it took IIPR minimal effort to confirm that Kings Garden had, from its very first submission of an invoice seeking money back from IIPR for improvements and construction purportedly completed, submitted obviously forged invoices and forms to IIPR, with the fraud totaling millions of dollars.

15.      Throughout the Relevant Period, the Individual Defendants told investors that they had always performed extensive background checks on IIPR's prospective tenants/operators and withheld cash from operators until IIPR assured itself that the money had been spent on approved

---

[1] On September 16, 2022, the Company announced that the parties eventually reached a confidential settlement.

projects. In addition to causing the IIPR to make false and misleading statements, the Individual

Defendants caused the Company to violate Generally Accepted Accounting Principles ("GAAP")

throughout the Relevant Period, as revealed by the Report. The GAAP violations allowed IIPR to

overstate rental revenues, real estate held for investment, net book value, earnings, net earnings,

and earnings per diluted share. Further, IIPR's GAAP violations led to it filing false financial

statements, preventing investors from fairly evaluating the risk of investing in IIPR.

16.    As a direct and proximate result of the Individual Defendants' breaches of fiduciary

duties, IIPR has sustained damages as described below.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because

Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. §

78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9). Plaintiff's claims also

raise a federal question pertaining to the claims made in the Securities Class Action based on

violations of the Exchange Act. This Court has supplemental jurisdiction over Plaintiff's state law

claims pursuant to 28 U.S.C. § 1367(a). This action is not a collusive action designed to confer

jurisdiction on the court of the United States that it would not otherwise have.

18.    This Court has personal jurisdiction over each of the Defendants because the

Company is a Maryland corporation and each defendant is either a corporation conducting business

and maintaining operations in this District, or is an individual who is either present in this District

for jurisdictional purposes or has sufficient minimum contacts with this District so as to render the

exercise of jurisdiction by this Court permissible under traditional notions of fair play and

substantial justice.

19.    Finally, the Bylaws of IIPR includes an exclusive forum selection clause requiring

all derivative actions in which the state courts of Maryland do not have subject matter jurisdiction, such as the case here, be brought in this Court.

## PARTIES

20.     Plaintiff is a current shareholder of IIPR. Plaintiff has continuously held IIPR common stock at all relevant times.

21.     IIPR, formed in June 2016, is a self-advised real estate investment trust ("REIT") focused on the acquisition, ownership, and management of specialized industrial properties leased to experienced, state-licensed operators for their regulated state-licensed cannabis facilities. IIPR is incorporated in Maryland, with its headquarters located at 1389 Center Drive, Suite 200, Park City, Utah 84098.

22.     Defendant Gold is a co-founder of IIRP, and has served as Executive Chairman of the Board since the Company's formation.

23.     Defendant Paul Smithers ("Smithers") co-founded IIPR and has served as IIPR's Chief Executive Officer ("CEO"), President, and a Director since IIPR's formation.

24.     Defendant Catherine Hastings ("Hastings") has served as IIPR's Chief Financial Officer ("CFO") since June 2017, as IIPR's Treasurer since January 2017, and served as IIPR's Chief Accounting Officer ("CAO") from January 2017 through January 2021.

25.     Defendant Tracie Hager ("Hager") has served as IIPR's Vice President of Asset Management since October 2019.

26.     Defendant Ben Regin ("Regin") has served as IIPR's Chief Investment Officer since January 2023 having previously served as IIPR's Vice President of Investments since January 2020 and having joined the Company as Director of Investments and Finance in January 2017.

27.     Defendant Andy Bui ("Bui") has served as IIPR's CAO and Vice President since January 2021. He previously served as IIPR's Controller, starting in May 2017.

28.     Defendant Gary A. Kreitzer ("Kreitzer") has served as a director since the Company's formation.

29.     Defendant David Stecher ("Stecher") has served as a director since November 2016.

30.     Defendant Scott Shoemaker, M.D. ("Shoemaker") has served as a director since November 2016.

31.     Defendant Mary Curran ("Curran") has served as a director since December 2019.

32.     Defendants Smithers, Hastings, Gold, Hager, Regin, Bui, Kreitzer, Stecher, Shoemaker, and Curran are collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

34.     The Individual Defendants, because of their positions of control and authority as

directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

35.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of IIPR were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

36.     Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

37.     The Company has adopted a Code of Business Conduct and Ethics (the "Code") that applies to all employees, including officers and members of the Board. The Code states:

> This Code of Business Conduct and Ethics contains general guidelines for conducting the business of the Company consistent with the highest standards of business ethics. This Code should be considered a minimum standard. To the extent that this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, we adhere to these higher standards.

38.     The Code goes on to state:

COMPANY RECORDS

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and other disclosures to the public and guide our business decision-making and strategic planning. Company records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files and all other records maintained in the ordinary course of our business. All Company records must be complete, accurate and reliable in all material respects. Undisclosed or unrecorded funds, payments or receipts are inconsistent with our business practices and are prohibited. You are responsible for understanding and complying with our record keeping policy. Ask your supervisor if you have any questions.

ACCURACY OF FINANCIAL REPORTS AND OTHER PUBLIC COMMUNICATIONS

> As a public company, we are subject to various securities laws, regulations and

reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. The Company's principal financial officers and other employees working in the Accounting Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

*** 

## PUBLIC COMMUNICATIONS AND REGULATION FD

Public Communications Generally
The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly affects our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. To ensure compliance with this policy, all news media or other public requests for information regarding the Company should be directed to the Chief Financial Officer. The Chief Financial Officer will work with you and the appropriate personnel to evaluate and coordinate a response to the request.

Compliance with Regulation FD
In connection with its public communications, the Company is required to comply with a rule under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD provides that, when we disclose material, non-public information about the Company to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

To ensure compliance with Regulation FD, we have designated the following officials as "Company Spokespersons:"

- Alan Gold, Executive Chairman
- Paul Smithers, President and Chief Executive Officer
- Catherine Hastings, Chief Financial Officer, Chief Accounting Officer and Treasurer

Only Company Spokespersons are authorized to disclose information about the Company in response to requests from securities market professionals or stockholders. If you receive a request for information from any securities market professionals or stockholders, promptly contact the Chief Financial Officer to coordinate a response to such request.

Company employees who regularly interact with securities market professionals are specifically covered by Regulation FD and have a special responsibility to understand and comply with Regulation FD. Contact the General Counsel if you have any questions about the scope or application of Regulation FD.

39.     Additionally, per IIPR's Audit Committee Charter, during the Relevant Period the purpose of the Audit Committee, comprised of Defendants Stecher, Curran, and Kreitzer (the "Audit Committee Defendants"), was to "assist the Board with its oversight responsibilities regarding: (i) the integrity of the Company's financial statements and internal controls over financial reporting; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditor; and (v) the Company's risk management programs."

40.     Pursuant to the Audit Committee Charter, the Audit Committee Defendants had the following responsibilities, *inter alia*:

Annual Financial Statements and Annual Audit

*Meetings with Management, the Independent Registered Public Accounting Firm and the Internal Auditor.*

(i)     The Committee shall meet with management, the independent registered public accounting firm and the internal auditor in connection with each annual audit to discuss the scope of the audit, the procedures to be followed and the staffing of the audit.

(ii)     The Committee shall review and discuss with management and the independent registered public accounting firm: (A) major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal

controls and any special audit steps adopted in light of material control deficiencies (including a discussion of management's process for assessing the effectiveness of internal controls under Section 404 of the Sarbanes-Oxley Act of 2002); (B) any analyses prepared by management or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including analyses of the effects of alternative GAAP methods on the Company's financial statements; and (C) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements.

(iii)    The Committee shall review and discuss the annual audited financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Separate Meetings with the Independent Registered Public Accounting Firm.*

(i)    The Committee shall review with the independent registered public accounting firm any problems or difficulties the independent registered public accounting firm may have encountered during the course of the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the independent registered public accounting firm are: (A) any accounting adjustments that were noted or proposed by the independent registered public accounting firm but were "passed" (as immaterial or otherwise); (B) any communications between the audit team and the independent registered public accounting firm's national office respecting auditing or accounting issues presented by the engagement; and (C) any "management" or "internal control" letter issued, or proposed to be issued, by the independent registered public accounting firm to the Company. The Committee shall obtain from the independent registered public accounting firm assurances that Section 10A(b) of the Exchange Act has not been implicated.

(ii)    The Committee shall discuss with the independent registered public accounting firm the report that such auditor is required to make to the Committee regarding: (A) all accounting policies and practices to be used that the independent registered public accounting firm identifies as critical; (B) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent registered public accounting firm, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (C) all other material written communications between the independent registered public accounting firm

and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent registered public accounting firm's engagement letter, independent registered public accounting firm's independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

(iii)     The Committee shall discuss with the independent registered public accounting firm the matters required to be discussed by Auditing Standard No. 16 (Communications with Audit Committees) or any successor as then in effect. 6. Recommendation to Include Financial Statements in Annual Report. The Committee shall, based on the review and discussions in paragraphs 4(iii) and 5(iii) above, and based on the disclosures received from the independent registered public accounting firm regarding its independence and discussions with the auditor regarding such independence pursuant to subparagraph 3(ii) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

*Quarterly Financial Statements*
*Meetings with Management and the Independent Registered Public Accounting Firm.* The Committee shall review and discuss the quarterly financial statements with management and the independent registered public accounting firm, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Internal Audit*
*Appointment.* The Committee shall review the appointment and replacement, and participate and provide input into the employment reviews, of the internal auditor. 9. Separate Meetings with the Internal Auditor. The Committee shall meet periodically with the Company's internal auditor to discuss the responsibilities, budget and staffing of the Company's internal audit function and any issues that the internal auditor believes warrant audit committee attention, including review of the internal auditor's assessments of the Company's risk management processes and system of internal control. The Committee shall discuss with the internal auditor any significant reports to management prepared by the internal auditor and any responses from management.

*Other Powers and Responsibilities*
The Committee shall discuss with management and the independent registered public accounting firm the Company's earnings press releases. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the

Company may provide earnings guidance.

The Committee shall discuss with management and the independent registered public accounting firm the Company's compliance with the applicable regulatory provisions required to maintain the Company's status as a Real Estate Investment Trust.

The Committee shall conduct a reasonable prior review of all related party transactions (meaning transactions required to be disclosed pursuant to Item 404 of Regulation SK) and shall review such transactions on an ongoing basis. Any such transaction determined by the Committee to be inconsistent with the interests of the Company and its stockholders will not be approved.

The Committee shall discuss with management and the independent registered public accounting firm any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function.

The Committee shall discuss with the Company's General Counsel or outside counsel any legal matters brought to the Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements.

The Committee shall request assurances from management, the independent registered public accounting firm and the Company's internal auditors that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of affiliated party transactions.

The Committee shall discuss with management the Company's policies with respect to risk assessment and risk management, including, without limitation, the Company's significant operational, regulatory and financial risk exposures, including risks associated with financial accounting and audits and internal control over financial reporting, and the actions management has taken to limit, monitor or control such exposures.

The Committee shall discuss with management the Company's policies and procedures with respect to data privacy and technology security and control.

The Committee shall set clear hiring policies for employees or former employees of the Company's independent registered public accounting firm.

The Committee shall establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters. The Committee shall also establish procedures for the

confidential and anonymous submission by employees regarding questionable accounting or auditing matters.

The Committee shall provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in the Company's annual proxy statement or Annual Report on Form 10-K.

The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent registered public accounting firm, the performance of the Company's internal audit function or any other matter the Committee determines is necessary or advisable to report to the Board.

The Committee shall at least annually perform an evaluation of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter.

The Committee shall at least annually review and reassess this Charter and submit any recommended changes to the Board for its consideration.

The Committee shall discuss any disclosures made to the Committee by the Company's Chief Executive Officer or Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q regarding: (i) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial data and any material weaknesses in internal controls identified to the independent auditor; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls.

The Committee shall read management's report (to be included in the Company's Annual Report on Form 10-K) assessing the effectiveness of the internal control structure and procedures of the Company for financial reporting and shall discuss with the independent registered public accounting firm such auditor's attestation to and report on the effectiveness of internal control over financial reporting.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

41.    IIPR portrays itself as a self-advised corporation focused on the acquisition, ownership and management of specialized properties leased to experienced, state-licensed

operators for their regulated medical-use cannabis facilities. IIPR delivers returns by collecting rent payments from its tenants/operators, and as a result, relies upon operators to run their facilities profitably and in compliance with the law.

42.     Because marijuana is not legal under federal law and a risky business, it is hard for marijuana owners to receive bank loans. IIPR saw the opportunity in this, buying land from operators at prices far higher than the growers themselves had paid for the property, with the excess sales price (sometimes 300% higher than the actual value of the property) extended back to the operator to invest and buy the necessary equipment to successfully farm and sell marijuana. Because of the newness of the market and the lack of available traditional financing sources, IIPR was able to charge high interest rates on its loans.

43.     Since finding a replacement operator to run a functioning marijuana facility would be extremely difficult, and likely involve lowered rents due from the replacement operators, IIPR represented in public filings and told investors that it had always performed extensive background checks on its prospective operators. For example, during an August 5, 2021, earnings conference call ("Q2 2021 call"), Gold told investors that IIPR spent "a great deal of time focus[ed] not only on the … proposed real estate transaction," but "a lot of time with the management team" doing "background checks on these tenants, understanding where they've come from and their reputations …."

**<u>KINGS GARDEN IS ONE OF THE COMPANY'S LARGEST TENANT/OPERATORS</u>**

44.     Kings Garden is one of IIPR's largest tenant/operator and is managed by its Founder, Chairman and CEO King.

45.     In 2019 IIPR entered into sale leaseback transactions for properties with Kings Garden. IIPR bought five fully operational facilities located in California from Kings Garden and

leased them back to Kings Garden on triple-net leases. Consistent with IIPR's practices, Kings Garden was responsible for all aspects of upgrading the facility, and growing and selling the cannabis. IIPR's interest was in collecting rents from Kings Garden, and earning interest on loans it made available to Kings Garden. As a result of the purchases, Kings Garden became IIPR's third largest operator.

46.    Throughout the Relevant Period, IIPR stated that its management did in-depth investigations on potential tenants. For example, in the risk warning section of the 2019 10-K, IIPR warned that "the success of our investments will be materially dependent on the financial stability of these tenants. We rely on our management team to perform due diligence investigations of our potential tenants…." Additionally, IIPR made public representations that lauded its relationship with Kings Garden, and King personally.

47.    However, in its 2022 lawsuit against Kings Garden and King, IIPR admitted that it relied on King Garden's "reputation" in choosing to contract with Kings Garden, and knew that King did not personally have a license to cultivate and distribute marijuana in California. In the lawsuit, IIPR also admitted that rather than check whether King had been cleared by the United States Department of Justice for federal licensing and had been "screened and cleared at all levels," IIPR merely accepted King's word that it was true. Taking the word of a person that was later alleged to be a fraudster, is in stark contrast from what the Company told investors it was doing in its business practices to ensure investors that it was not risking their money getting into business with unethical, criminal perpetrators of fraud.

48.    IIPR failed to perform even a basic background check on King. Indeed, when launching the lawsuit, it only took IIPR minimal effort to confirm that Kings Garden had, from its very first submission of an invoice seeking money back from IIPR for improvements and

construction purportedly completed, submitted obviously forged invoices and forms to IIPR, resulting eventually in a fraud totaling millions of dollars.

49.     In the 2020 10-K, IIPR disclosed that as of December 31, 2020, its largest investment in any operator was in Kings Garden, with an investment of approximately $70 million.

50.     In the 2021 10-K, IIPR disclosed that as of December 31, 2021, its investment in Kings Garden was approximately $83 million, its third largest investment in any operator.

51.     During the August 5, 2021 earnings conference call, Defendant Regin stated that IIPR's total investment in Kings Garden was approximately $150 million.

52.     Throughout the Relevant Period, IIPR issued risk warnings about the risks of contracting with the wrong tenants, and that is why the Company performed extensive background checks on them. For example, in the risk warning section of the 2019 10-K, IIPR warned that "the success of our investments will be materially dependent on the financial stability of these tenants. We rely on our management team to perform due diligence investigations of our potential tenants…."

53.     In public statements, IIPR also touted its relationship with Kings Garden, and lauded King personally.

54.     During the February 25, 2021 earnings conference call, Defendant Regin discussed Kings Garden and King stating:

> Kings Garden is one of the top operators in California, consistently ranking in the top 5 of flower and concentrate sales in the state, and as you may recall, was one of the first cannabis operators to commence regular quarterly dividends to its shareholders in June 2020, a remarkable achievement for a company continuing on its rapid expansion path.
>
> ***
>
> We are proud partners of Michael King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and continue to deliver the

highest-quality product that they are known for.

\*\*\*

But needless to say, we are thrilled to team with Kings Garden in California.

55.     During the August 5, 2021 earnings conference call, the Individual Defendants

continued touting Kings Garden.[2] For example, Defendant Regin stated:

Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world.

\*\*\*

Kings Garden is yet another example of our tenant partners focused on long-term, responsible, sustainable production.

56.     Also during the August 5, 2021 call, in response to an analyst question about how

IIPR evaluates whether to make investments in potential operators, Defendant Gold stated:

We spent a great deal of time focus not only on the real estate -- the proposed real estate transaction that brings those tenants to IIPR. ***But we spent a lot of time with the management team, evaluating their skills and expertise*** in running not only a business, but in marketing and then most specifically in growing. ***And we utilize our existing network of growers to do background checks on these tenants, understanding where they've come from and their reputations in the specific state or just in the industry in general.***

57.     During the February 24, 2022 earnings conference call, Defendant Regin stated:

With their brand reputation and operational expertise driving financial results, the Kings Garden team has also been one of the uniquely positioned operators to return capital to its long-term owners in the form of dividends, including $3 million in each of the last 2 years. We are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come.

58.     Even after the Report was issued, the Individual Defendants still continued the

---

[2] While the Individual Defendants were lauding Kings Garden, Kings Garden was already submitting false documents to IIPR. In its lawsuit against Kings Garden and King, IIPR states that there is "[u]ndisputed evidence that Defendants obtained $49 million in construction funds using forged general contractor forms AIA G-702." *IIP-CA 2 LP v. Kings Garden, Inc., et al*. ("Plaintiff IIP-CA G 2 LP Supplemental Reply in Support of Application to Appoint Receiver") (No. CVPS2202975 0000033454127) (filed August 26, 2022).

charade of glorifying IIPR's relationship with Kings Garden. In a May 5, 2022 earnings conference call, held after the Report had been released, and after IIPR's rejection of everything in the Report, Defendant Gold told investors that "we plan to focus on 2 of our tenant partners, Parallel and Kings Garden, and do a deeper dive into our underwriting fundamentals, as applied specifically to these 2 private company tenants." Defendant Regin also stated:

> We made our initial investment with Kings Garden in April 2019 …. [a]t that time, we evaluated Kings Garden, as a leading indoor cannabis operator in California with profitable operations and a distribution agreement with one of the largest distributors in the state, delivering Kings Garden products to over 60% of the state's regulated dispensaries. In May of 2020, we followed with the acquisition of a fully operational property …. [s]hortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business.

### IIPR's Lack of Adequate Internal Controls Led to IIPR Not Properly Investigating Kings Garden and King

59.     In IIPR's lawsuit against Kings Garden and King, IIPR discussed at length how Kings Garden defrauded IIPR and the facts demonstrate that the Individual Defendants should have known about, or recklessly disregarded, Michael's King's fraudulent background.

60.     Between April 16, 2019, and March 25, 2021, IIPR and Kings Garden entered into multiple leases where IIPR was required to reimburse Kings Garden for approved expenditures to improve the facilities, with Kings Garden to supply supporting documentation in support of any reimbursement. Any such "Draw Request" had to be sent to IIPR's "Construction Team," which reported to Defendant Hastings, IIPR's CFO. The Construction Team would then, per IIPR, "review [any request for reimbursement] "for accuracy and compliance with acceptable construction parameters." For years, IIPR's Construction Team failed to notice, or correct, Kings Garden's blatant forgeries and thefts.

61.     Prior to entering into the leases with Kings Garden, IIPR had multiple

"meetings, e-mails, teleconferences, and video calls" with Kings Garden and all of its principals, including King. The topic of all of these meetings and communications was "the financial condition of [Kings Garden]." IIPR claims that Kings Garden had "a duty … to correct errors in any information provided from [Kings Garden] to [IIPR]." However, the Individual Defendants also had a duty to put in place adequate internal controls that would ensure the review of financial information it received from Kings Garden to assure that it was true. The Individual Defendants utterly failed to fulfill this duty.

62.     In November 2020, IIPR entered into a sale-leaseback transaction with Kings Garden for the San Bernardino Project, with allowance for up to $25 million in Draw Requests. In the lease IIPR was required to fund construction projects to approve the property. Between July 29, 2021, and June 1, 2022, Kings Garden submitted six Draw Requests totaling approximately $21.6 million. All but the last Draw Request was received, approved, and paid by IIPR before the Report was released on April 14, 2022.

63.     In February 2021, IIPR entered into a sale-leaseback transaction with Kings Garden for the 19th Street Property, with allowance for up to $51.4 million in Draw Requests. In the lease, IIPR was required to fund  construction projects to approve the property. Between September 3, 2021, and June 1, 2022, Kings Garden submitted six Draw Requests totaling approximately $26.9 million. All but the last Draw Request was received, approved, and paid by IIPR before the Report was released on April 14, 2022.

64.     Only after Defendants read the April 14, 2022 Report (which they publicly dismissed and rejected the day it was issued) did the Individual Defendants ever review the Draw Requests to see if there were any irregularities.

65.     On June 1, 2022, Kings Garden submitted its sixth Draw Request for the 19th Street

Property. After the Report was released, the Individual Defendants finally had questions regarding Kings Garden. Noticing that the numbers on the Draw Request simply did not match the supporting documentation, the Construction Team called Kings Garden and asked for additional documentation. Kings Garden stated that it did not have access to additional information, and asked the Individual Defendants to fund the Draw Request anyway. IIPR refused, and convened a video call, during which Kings Garden admitted that its own personnel had always been forging the Draw Requests and related forms by preparing and authenticating them internally, when only the general contractor was supposed to prepare and authenticate these forms. IIPR had finally noticed Kings Garden's forgeries and theft.

66.     As a result, IIPR began a "retro-active review of [Kings Garden's] past Draw Requests" for both projects, all of which it had approved and had paid Kings Garden millions of dollars. In the very first Draw Request Kings Garden had ever submitted, for almost $1.5 million, IIPR noticed "inconsistent font types and text boxes that appeared to have been added to an old invoice." Further, a simple examination of the "metadata from the *pdf of this particular form indicated that the base form was created in 2017," years before IIPR purchased the Kings Garden properties. Thus, the very first Draw Request was an obvious forgery.

67.     Only then, according to IIPR, did it then actually begin looking at Kings Garden's financial statements, even though in a (self-serving) Declaration King filed in the lawsuit brought by IIPR against him, King stated that "[s]ince November 2019, Kings Garden has provided, on a quarterly basis, quarterly and annual financial information, including balance sheets and income statements, to IIP[R]."[3] The only problem is that the financials provided by Kings Garden to IIPR were obviously fraudulent. Upon finally looking closely at Kings Garden's financials, IIPR

---

[3] *IIP-CA 2 LP v. Kings Garden, Inc., et al.* (No. CVPS220975 0000033280630), filed September 9, 2022.

quickly discovered that "well over $15 million" had exited Kings Garden's accounts in 2021 and 2022, including "suspicious loans'" to "individuals [who] have ties to organized crime," evidencing a "business conducting a fraudulent business operation."

68.     IIPR's Construction Team then contacted the contractor listed on invoices for both the 19th Street expansion and the San Bernardino Property, who told IIPR that there were many forged invoices, documents, and signatures. The total of the forged invoices was in the millions of dollars.

69.     IIPR's Construction Team then contacted parties that had allegedly performed work on the two Projects, and actually visited the properties. IIPR learned that the discrepancy between the invoices paid and the value of actual work performed was in the millions of dollars.

70.     In June 2022 IIPR told Kings Garden that it would provide no more funding for Draw Requests until all discrepancies were resolved. In response, Kings Garden told IIPR that "it was out of money and would not be paying its July 2022 rent on the Premises," or actually no more rent whatsoever. IIPR failed to look at the very first Draw Request submitted by Kings Garden at the time it was submitted, which was an obvious forgery. If they had, the Individual Defendants would not have given away millions and millions of dollars, and lost 8% of the Company's annual rental revenue.

71.     In the lawsuit against Kings Garden, IIPR called Kings Garden's forgeries a "Madoff-style Ponzi Scheme," carried out through "pervasive"  forgeries, demonstrating that this was a continuous practice. Once the Individual Defendants investigated King's background, IIPR immediately discovered "a history of deception: over 32 lawsuits, felony charges, name changes, and fraudulent conduct," as well as that King has been sued for fraud by his own family members.

72.     The Individual Defendants should have done an adequate investigation of King, or

for that matter any investigation of him, before causing IIPR to enter into a relationship with him.


## THE REPORT

73.     On April 14, 2022, the Report was released. With respect to King and Kings

Garden, Blue Orca detailed a lawsuit against Kings Garden and King, stating:

> IIPR's second largest tenant is a private California cannabis company, Kings
> Garden. In May 2021, its co-founder sued Kings Garden and its executives alleging
> unlawful and fraudulent conduct with respect to Kings Garden's financial,
> regulatory and tax reporting. Notably, the lawsuit accused Kings Garden of
> falsifying books and records and of selling substantial quantities of illegal cannabis
> on the black market. The complaint was recently refiled in Florida court. In another
> action filed in 2019, an investor filed a complaint alleging selfdealing and
> "irregular" transactions. While we have no view on the merits of the complaints
> and none of these lawsuits have resulted in adverse outcomes for the cannabis
> company, the Kings Garden allegations should concern investors not only because
> of conduct alleged but also because the market value of the properties appears to
> be substantially lower than IIPR carries them on its balance sheet – a theme
> consistent across IIPR's portfolio. If we look at the portfolio of Kings Garden
> properties, based on the price paid by Kings Garden before flipping them to IIPR,
> we estimate that the residual value of the properties is a fraction of the carrying
> value of the properties on IIPR's balance sheet and that even assuming a 10% yield,
> rent from a replacement tenant would likely be more than 80% lower.
>
> ***
>
> "M. King used and continues to use Kings Garden as his personal piggyback
> thereby … decreasing the value of … investors' ownership interests in IIPR by
> millions of dollars."
>
> ***
>
> These allegations of black-market cannabis sales, if substantiated, put the permits
> and licenses of IIPR's second largest tenant in jeopardy. The allegations of
> falsifying books and records, including financial, regulatory and tax reporting, also
> raise the question of whether such records were submitted to IIPR, which IIPR
> relied on in underwriting its investment.

74.     The Report also discussed a second lawsuit against Kings Garden stating:

> It is also not the first time that Kings Garden faced allegations of self-dealing, poor
> corporate governance, and a lack of transparency around its financial affairs. In
> January 2019, an investor sued Kings Garden in California alleging that it had not
> received any of the quarterly distributions owed to it by the cannabis company

under the terms of its investment.

The investor, Swiss American Investment, said that it had discovered a series of "irregular" financial transactions involving millions of dollars between Kings Garden and the managing directors, including loans made to purchase real estate which was then leased back to the company.

Many of the themes of the Swiss American Investment lawsuit echo the more recent allegations, including allegations regarding the integrity of Kings Garden's financial records. The lawsuit was also brought shortly after Kings Garden "halted" its planned IPO process in 2018. The result of the lawsuit remains shrouded in mystery as the case was referred to non-public arbitration.

Although we express no opinion on the merits of the complaints, and Kings Garden has not been the subject of an adverse judgment, to our knowledge, in either case, we think such controversies should raise concerns regarding the tenant quality in IIPR's portfolio. Like Parallel, if Kings Garden finds itself in a distress, IIPR will struggle to replace this income stream with a new tenant. This is because historical transactions suggest that the Kings Garden properties are worth substantially less than IIPR carries them on its balance sheet, and clearly, in a release scenario, we doubt that IIPR would achieve anywhere near a 17%–30% yield.

75.     Kings Garden was not the only IIPR tenant to come under fire. The Report also stated that IIPR's "largest tenant is a failed SPAC that appears in severe financial distress and was recently sued by investors accusing it of securities fraud and being in effect a Ponzi scheme." The Report stated:

**1. Parallel: IIPR's Largest Tenant in Default on Debt and Accused of Being Ponzi Scheme in March 2022 Investor Lawsuits**. IIPR's largest tenant is cannabis company Parallel, which tried to go public via SPAC in 2021. The deal collapsed when the sponsor (led by Justin Bieber's manager Scooter Braun) **reportedly** pulled out after losing confidence in Parallel's business and financial projections. In March 2022, several investors filed a lawsuit in Florida against Parallel and its former CEO alleging securities fraud. In the complaint, which was only unredacted last week, investors allege that Parallel misrepresented its financial projections, is in default on $350 million in debt, hemorrhages cash and is in essence a "Ponzi scheme." A group of creditors filed another lawsuit in N.Y. last month, alleging that Parallel defrauded them and was in default on its debts. Taken together, these lawsuits suggest that Parallel is in severe distress and faces imminent risk of default on its leases.

a. **Substantial Impairment in Property Value and ~70% Downside in Rental Income in the Event of Parallel Default**. Whereas most REITs can simply re-

lease vacant properties in the event of tenant default, we think IIPR will struggle to replace the lost income. That's because IIPR's model is to overpay cannabis companies for properties as a form of lending, recouping the loan through an above market, long-term lease. This means a risk of severe markdowns if Parallel defaults. IIPR purchased its Pittsburgh property from Parallel for $42 million, nearly double the price paid by Parallel to acquire the same property the day before Parallel flipped it to IIPR. With a further $26 million in tenant improvements, IIPR effectively loaned $46 million to Parallel on top of the real estate purchase on the promise that Parallel would repay the loan in the form of a long-term lease. If we look at the portfolio of Parallel properties, based on the price paid by Parallel before flipping them to IIPR, we estimate that the residual value of the properties is a fraction of the carrying value of the properties on IIPR's balance sheet and that even assuming a 10% yield, rent from a replacement tenant would likely be 70% lower.

76.     The Report, using tax records, described how IIPR recorded the fair value of its purchases from Kings Garden and Parallel at its purchase price, when the true fair value of those properties, as evidenced by the amounts Kings Garden and Parallel paid for them, was exponentially lower. Blue Orca thus described that the market value of these properties was far lower than the carrying amounts on IIPR's balance sheets.

77.     The Report described multiple sale-leaseback transactions by IIPR with Kings Garden or Parallel.[4] In each transaction, IIPR paid a far higher price for the properties than Kings Garden or Parallel had paid, and in each case IIPR recorded the purchase price as the fair value (book value) of its purchase, in violation of GAAP.

78.     In April 2019, IIPR purchased its first property from Kings Garden, the N. 19th Avenue Property, for $15 million. One year earlier, in April 2018, Kings Garden had acquired the property for $3.9 million.

79.     Also in April 2019, IIPR purchased the N. Anza Road #1 Property from Kings Garden for $5.8 million In January 2017, Kings Garden had acquired the property for $2.5 million.

---

[4] Like Kings Garden, Parallel was one of IIPR's top five operators.

80.     In April 2019, IIPR also purchased the N. Anza Road #2 Property from Kings Garden for $6.3 million In May 2016, Kings Garden had acquired the property for $3.3 million.

81.     In May 2020, IIPR acquired the Mclane Street Property from Kings Garden for $17.5 million. The Mclane Street Property had been acquired by Kings Garden in May 2017 for only $3.75 million.[5]

82.     Starting in 2020, IIPR acquired four properties in sale-leaseback transactions from Parallel, investing $203 million. Blue Orca provided details about three of these transactions.

83.     In March 2020, IIPR paid Parallel $35.3 million for a property in Wimauma, Florida. In September 2017, Parallel (at the time known as Surterra) had purchased the property for $9.2 million.

84.     In September 2020, IIPR paid Parallel $19.6 million for a property in Lakeland, Florida. In February 2019, Parallel had purchased the property for $3.62 million.

85.     In May 2021, IIPR paid Parallel $41.8 million for the Northside Commerce Center Property in Pittsburgh, Pennsylvania. Just one day earlier, Parallel had purchased the property for $22 million.

## IIPR's GAAP VIOLATIONS

86.     Throughout the Relevant Period, IIPR recorded the fair value of its sale-leaseback purchases from both Kings Garden and Parallel at its purchase price, even as the price it paid was many times the purchase price paid by Kings Garden and Parallel for the properties not long before the sale-leaseback transaction.

87.     IIPR's accounting for these transactions violated several GAAP provisions, and throughout the Relevant Period IIPR's quarterly and annual financial statements were materially

---

[5] The Report discussed only these four of IIPR's six properties purchased from Kings Garden, stated that it was "unable to due diligence" the other two properties.

false, presenting an inaccurate picture of IIPR's finances to investors.

88.     GAAP refers to the framework of guidelines for financial accounting used to prepare financial statements. The SEC has the statutory authority to set accounting standards and has delegated that authority to the Financial Standards Accounting Board ("FASB").

89.     The FASB accounting standards codification ("ASC") and the SEC rules and interpretive releases are sources of authoritative GAAP for SEC registrants. SEC Staff also issues Staff Accounting Bulletins ("SABs") which represent practices followed by the SEC staff in administering SEC disclosure requirements. ASC 105-10-05-1.

90.     SEC rules and regulations require that publicly traded companies include GAAP-compliant financial statements in their annual and quarterly reports filed with the SEC. *See* Section 13 of the Exchange Act; SEC Rule 10-01(d) of Regulation S-X ("Reg. S-X"). SEC Rule 4-01(a) of Reg. S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

91.     According to the FASB Statement of Financial Accounting Concepts ("CON") No. 8, "[t]he omission or misstatement of an item in a financial report is material if, in light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item." CON 8 ¶ QC11. According to SAB 99, evaluating materiality requires viewing the facts in the context of surrounding circumstances or as a "total mix," considering both quantitative and qualitative factors. SAB 99 recognizes that a 5% threshold in relation to individual line-item amounts, subtotals, or totals in the financial statements is often

used as a "rule of thumb" in assessing materiality but cautions that such evaluation should be only the beginning of a materiality assessment and "cannot appropriately be used as a substitute for a full analysis of all relevant considerations." Misstatements of financial statements which are less than 5% "could well be material. Qualitative factors may cause misstatements of quantitatively small amounts to be material." *Id.* According to the SEC staff, "[t]he materiality of a misstatement may turn on where it appears in the financial statements" and "whether the misstatement masks a change in earnings or other trends … [or] concealment of an unlawful transaction." *Id.*

92.     The Public Company Accounting Oversight Board ("PCAOB"), a nonprofit corporation established by Congress to oversee the audits of public companies, established auditing standards that provide that "[t]he financial statements are management's responsibility … Management is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, initiate, record, process, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements." PCAOB Auditing Standard ("AS") 1001.03. Further, an "entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management ... Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility." *Id*.

**IIPR Violated GAAP in Accounting for its Sale-Leaseback Transactions**

93.     ASC 842, *Leases*, governs the accounting for leases, including sale- leaseback transactions. Throughout the Relevant Period IIPR violated ASC 842 in accounting for its sale-leaseback transactions with two of its largest operators, Kings Garden and Parallel.

94.     GAAP required IIPR to allocate the total cost of the acquired assets to individual assets (*e.g.*, building vs. land) based on their relative fair values. ASC 805-50-30-3. Fair value is defined in GAAP as the price that would be received from the sale of an asset or paid to transfer a liability in an orderly transaction between market-participants. ASC 820-10-20.

95.     When entering into sale-leaseback transactions, IIPR was required to determine whether its sale-leaseback transactions were done "at fair value on the basis of difference between either of the following, whichever is more readily determinable:

(a)     The sale price compared to the fair value of the underlying asset.

(b)     The present value of the contractual lease payments compared to the present value of fair market value lease payments." ASC 842-40-30-1.

96.     IIPR should have maximized the use of observable prices and observable information (such as recent sales data of the underlying assets) when making this assessment given, as IIPR stated in its 2021 10-K, the "uncertain regulatory environment in the United States relating to the medical-use cannabis industry and the uncertainty of collectability of lease payments from each tenant due to its limited operating history," which led IIPR to record rental revenues on a cash basis.

97.     In fact, not only is the accounting guidance related to sales at other than fair value clearly stated in GAAP, ASC 842 even includes the following example, which closely fits the fact pattern of the sale-leaseback transactions at issue in this case:[6]

> An entity (Seller) sells a piece of land to an unrelated entity (Buyer) for cash of $2 million. … At the same time, Seller enters into a contract with Buyer for the right to use the land for 10 years (the leaseback), with annual payments of $120,000 payable in arrears. This Example ignores any initial direct costs associated with the transaction. The terms and conditions of the transaction are such that Buyer obtains substantially all the remaining benefits of the land on the basis of the combination of the cash flows it will receive from Seller during the leaseback and the benefits

---

[6] Parts of the example which discuss seller's accounting for the transaction have been removed as they are not relevant to IIPR's accounting as the buyer.

that will be derived from the land at the end of the lease term. In determining that a sale occurs at commencement of the leaseback, Seller considers that, at that date, all of the following apply:

(a)     Seller has a present right to payment of the sales price of $2 million.

(b)     Buyer obtains legal title to the land.

(c)     Buyer has the significant risks and rewards of ownership of the land because, for example, Buyer has the ability to sell the land if the property value increases and also must absorb any losses, realized or unrealized, if the property value declines.

The observable fair value of the land at the date of sale is $1.4 million. Because the fair value of the land is observable, both Seller and Buyer utilize that benchmark in evaluating whether the sale is at market term. Because the sale is not at fair value (that is, the sales price is significantly in excess of the fair value of the land), both Seller and Buyer adjust for the off- market terms in accounting for the transaction. … The amount of the excess sale price of $600,000 ($2 million – $1.4 million) is recognized as additional financing from Buyer to Seller (that is, Seller is receiving the additional benefit of financing from Buyer). … The leaseback is classified as an operating lease.

***

Also, at the commencement date, Buyer recognizes the land at a cost of $1.4 million and a financial asset for the additional financing provided to Seller of $600,000. Because the lease is an operating lease, at the date of sale Buyer does not do any accounting for the lease.

In accounting for the additional financing to Seller, Buyer uses 6 percent as the applicable discount rate, which it determined in accordance with paragraphs 835-30-25-12 through 25-13. Therefore, Buyer will allocate $81,521 of each lease payment to Buyer's financial asset and allocate the remaining $38,479 to lease income. After initial recognition and measurement at each period of the lease term, Buyer will do both of the following:

(a)     Decrease the financial asset for the amount of each lease payment received that is allocated to that obligation (that is, $81,521) and increase the carrying amount of the obligation for interest accrued on the financial asset using Seller's incremental borrowing rate of 6 percent. Consistent with Seller's accounting, at the end of Year 1, the carrying amount of the financial asset is $554,479 ($600,000 – $81,521 + $36,000).

(b)     Recognize the interest income on the financing obligation (for example, $33,269 in Year 2) and $38,479 in operating lease

income.

At the end of the lease term, the carrying amount of the financial asset is $0, and Buyer continues to recognize the land. [Emphasis added.] ASC 842-40-55-23 – 30.

98.     As the example makes clear, recording IIPR's entire purchase price as fair value violates GAAP. As detailed in the Report, IIPR rental properties which it purchased from and leased back to Parallel and Kings Garden, two of its largest tenants, were valued significantly less than IIPR's purchase price. When purchasing assets from cannabis producers at more than their fair value, GAAP required IIPR to adjust the sale price, record the acquired assets at fair value, and account for the excess of IIPR's costs over the fair value of the assets acquired as additional financing provided by IIPR to the cannabis producers. ASC 842-40-30-2. Accounting for the excess purchase price involves recording the assets at a lower value and recording an advance receivable from the cannabis producers. Subsequent rent payments received by IIPR had to be allocated between rental income and debt service (i.e., interest income and payment of principal on the advance receivable). ASC 842-40-55-23 – 30. Yet IIPR chose not to apply ASC 842's straightforward requirements, or the guidance offered in that provision under a similar fact pattern.

99.     Instead of following the clearly defined accounting standards, IIPR recorded the assets it acquired in sale-leaseback transactions from Parallel and Kings Garden at their full cost without recognizing excess of cost over fair value as advances to these cannabis producers, thus overstating the initial carrying values of IIPR's real estate assets and completely avoiding showing advances to these cannabis producers on IIPR's balance sheet. This practice enabled IIPR to hide the true extend of its lending activities. Moreover, because none of the rental payments IIPR received were allocated to debt service, its rental revenues were overstated during the Relevant Period.

**IIPR VIOLATED GAAP BY FAILING TO IMPAIR THE CARRYING VALUES OF ITS**

**REAL ESTATE INVESTMENTS**

100.    ASC 360, *Property, Plant, and Equipment*, is the authoritative accounting standard which governs the accounting for long-lived assets, including evaluation of these assets for impairment. Throughout the Relevant Period IIPR violated ASC 360 in accounting for rental properties it leased to Parallel and Kings Garden as part of sale-leaseback transactions.

101.    In addition to costs to acquire real estate, IIPR also capitalized various other costs, such as tenant allowances and building improvements, incurred subsequent to acquisition. IIPR provided such generous tenant allowances that at the end of 2021, IIPR's costs capitalized subsequent to acquisition exceeded IIPR's initial costs to acquire its rental properties. These capitalized costs further inflated the carrying values of IIPR's real estate assets.

102.    Subsequent to their acquisition, GAAP required IIPR to measure its rental properties leased to cannabis producers for impairment in accordance with the guidance in ASC 360-10-35. ASC 842-30-35-6. Under ASC 360-10-35, IIPR was required to regularly review the carrying value of its rental properties and write down the value of those assets whose values were not recoverable. More specifically, GAAP required IIPR to carry out the following steps:

(a)    <u>Step 1</u>: Consider whether indicators of impairment were present. ASC 360-10-35-21.

(b)    <u>Step 2</u>: If impairment indicators were present, or if other circumstances indicate that an impairment might exist, perform a recoverability test by comparing the sum of the estimated undiscounted future cash flows attributable to each property in question to its carrying amount. ASC 360-10-35-17; ASC 360-10-35-23, ASC 360-10-35-29 – 35.

(c)    <u>Step 3</u>: If the undiscounted cash flows used in the test for recoverability were less than the carrying amount of a property, determine the fair value of such property and recognize an impairment loss if the carrying amount exceeds the property's fair value. ASC 360-10-35-17; ASC 360-10-35-36.

103.    GAAP provides the following non-exclusive list of examples of events or changes

in circumstances that indicate the carrying amount of a long-lived asset might not be recoverable

to assist management in determining when long-lived assets should be evaluated for impairment:

> (a) A significant decrease in the market price of a long-lived asset (asset group)
>
> (b) A significant adverse change in the extent or manner in which a long- lived asset (asset group) is being used or in its physical condition
>
> (c) A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator
>
> (d) An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group)
>
> (e) A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group)
>
> (f) A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent. ASC 360-10-35-21.

104.    IIPR disclosed that it evaluates the following indicators on a property- by-property

basis to determine whether an impairment evaluation is necessary:

- significant fluctuations in estimated net operating income
- occupancy changes
- significant near-term lease expirations
- current and historical operating and/or cash flow losses
- construction costs
- estimated completion dates
- rental rates, and other market factors
- deterioration in rental rates for a specific property
- deterioration of a given rental submarket
- significant change in strategy or use of a specific property or any other event that could result in a decreased holding period, including classifying a property as held for sale, or significant development delay

- evidence of material physical damage to the property
- default by a significant tenant when any of the other indicators above are present (See 2001 Form 20-K, pages 69 and F-8 – F-9)

105. GAAP provides the following guidance, with respect to estimating future cash flows used to test long-lived assets for recoverability in Step 2:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall include only the future cash flows (cash inflows less associated cash outflows) that are directly associated with and that are expected to arise as a direct result of the use and eventual disposition of the asset (asset group). Those estimates shall exclude interest charges that will be recognized as an expense when incurred.

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and shall consider all available evidence. The assumptions used in developing those estimates shall be reasonable in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or information communicated to others. However, if alternative courses of action to recover the carrying amount of a long-lived asset (asset group) are under consideration or if a range is estimated for the amount of possible future cash flows associated with the likely course of action, the likelihood of those possible outcomes shall be considered. A probability-weighted approach may be useful in considering the likelihood of those possible outcomes.

> \*\*\*

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is in use, including a long-lived asset (asset group) for which development is substantially complete, shall be based on the existing service potential of the asset (asset group) at the date it is tested. The service potential of a long- lived asset (asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset (asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset (asset group). Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is under development shall be based on the expected service potential of the asset (group) when development is substantially complete. Those estimates shall include cash flows associated with all future expenditures necessary to develop a long-lived asset (asset group), including

interest payments that will be capitalized as part of the cost of the asset (asset group). [Emphasis added.] ASC 360-10-35- 29–33.

106.    For those properties whose carrying value was not recoverable (*i.e.*, the net undiscounted cash flows were below the net book value), IIPR was required to perform Step 3, measure the fair value of the rental properties and recognize an impairment loss equal to the excess of their carrying value over their respective fair value.

107.    As detailed in the Report, IIPR rental properties which it purchased from and leased back to Parallel and Kings Garden, two of its largest tenants, were valued significantly less than IIPR's initial purchase price and subsequent carrying values. Moreover, according to the Report, many of IIPR's tenants were experiencing financial difficulties, especially solvency problems at Parallel and Kings Garden. These conditions should have triggered the Individual Defendants to evaluate its properties for impairment, particularly those rented to Parallel and Kings Garden, as early as 2019, prior to the start of the Relevant Period.

108.    IIPR claimed in its 2020 10-K and 2021 10-K that when triggering events or impairment indictors were identified, it "review[ed] an estimate of future undiscounted cash flows for the properties, including, if necessary, a probability- weighted approach if multiple outcomes are under consideration." In each case IIPR did not record an impairment because it concluded that the property's carrying value was recoverable as it was below IIPR's projected undiscounted cash flows over the holding period:

> For each property where such an indicator occurred, we completed an impairment evaluation. After completing this process, we determined that for each of the operating properties evaluated, undiscounted cash flows over the holding period were in excess of carrying value and, therefore, we did not record any impairment losses for these properties for the years ended December 31, 2021 and 2020.

109.    However, the only way that IIPR could conclude that the carrying value of its real

estate assets (including substantial costs capitalized subsequent to acquisitions) was recoverable was to either ignore or not assign sufficient appropriate weight to the possibility that cannabis producers would not be able to make future rental payments to IIPR. In fact, the level of uncertainty regarding the regulatory environment in the United States relating to the medical-use cannabis industry and the uncertainty of collectability of lease payments from each tenant due to their limited operating history was so high that it required IIPR to record rental revenues on a cash basis (*i.e.*, when and if collected). According to the Report, many of IIPR's tenants were experiencing declines in financial performance, especially solvency problems at Parallel and Kings Garden. As a matter of fact, King Garden's financial difficulties culminated in its default on rent in July 2022, shortly after the end of the Relevant Period. However, these conditions were apparently either ignored or not given enough weight by the Individual Defendants when developing IIPR-specific projections of future undiscounted cash flows.

110.    If IIPR had performed a proper impairment analysis of its Parallel and Kings Garden properties, it would have determined that the carrying value of these properties was not recoverable and recorded an impairment charge no later than during fiscal 2020. IIPR's failure to timely record appropriate impairment charges resulted in an overstatement of its real estate investments and total asset balances as well as overstatement of IIPR's income from operations, net income, and earnings per share during the Relevant Period.

**IIPR Violated GAAP by Failing to Develop an Estimate of Expected Credit Losses on its Advances to Cannabis Producers**

111.    As discussed above, IIPR failed to follow GAAP and recognize as advances receivable the excess of IIPR's purchase price over the fair value of properties IIPR purchased from and leased back to Parallel and Kings Garden. Consequently, the balances of these advances were recorded as part of the carrying value of the underlying properties on IIPR's balance sheet

and was subject to evaluation for impairment in accordance with ASC 360.

112.    However, had IIPR properly recorded these advances on its balance sheet, as required by GAAP, it would have been also required to evaluate the collectability of these advances using a new accounting standard for measuring credit losses on financial instruments – Accounting Standards Update ("ASU") 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments*. IIPR adopted the new guidance, which contains significant changes in accounting for credit losses, on January 1, 2020. The new standard's goal was to improve financial reporting by requiring earlier recognition of credit losses on financing receivables and other financial assets in its scope. Entities in the financial service industry, particularly banks and others with lending operations, were most notably impacted by the adoption of the new standard. Because IIPR had hidden the extent of its lending activities through improper accounting for its sale-leaseback transactions, it avoided being significantly impacted by the new standard, disclosing only that the new standard did not have a material impact on IIPR's financial statements:

> In June 2016, the FASB issued ASU 2016-13, Financial Instruments-Credit Losses, which changes the impairment model for most financial assets and certain other instruments. For trade and other receivables, held-to- maturity debt securities, loans and other instruments, companies will be required to use a **new forward-looking *"expected loss" model that generally will result in the earlier recognition of allowances for losses.*** In November 2018, the FASB issued ASU 2018-19, Codification Improvements to Topic 326, Financial Instruments - Credit Losses, which among other updates, clarifies that receivables arising from operating leases are not within the scope of this guidance and should be evaluated in accordance with Topic 842. For available-for- sale debt securities with unrealized losses, companies will measure credit losses in a manner similar to what they do today, except that the losses will be recognized as allowances rather than as reductions in the amortized cost of the securities. ***These standards were effective for IIPR on January 1, 2020 and did not have a material impact on our consolidated financial statements.***

[Emphasis added.]

113.     The Report specifically discussed solvency problems at Parallel and Kings Garden. As a matter of fact, King Garden's financial difficulties culminated in its default on rent in July 2022, shortly after the end of the Relevant Period. However, because, IIPR never recorded advances it made to Parallel and Kings Garden, in violation of GAAP, it avoided having to evaluate the impact of these conditions on the collectability of these advances or develop an estimate of expected credit losses thereon. As IIPR itself admitted, the new standard is forward-looking which could result in recognizing credit losses sooner. Any credit losses on advances to cannabis producers would have reduced IIPR's total assets, income from operations, net income, and earnings per share during the Relevant Period.

**IIPR's Sale-Leaseback Transactions with Kings Garden or Parallel**

114.     On April 16, 2019, before the start of the Relevant Period, IIPR acquired a portfolio of properties in South California from Kings Garden at a total price of $27.1 million. Using the most recent sale data for the underlying properties cited in the Report, and assuming a 5% per annum property price appreciation (same as in the Report) indicates that IIPR's total purchase price for this portfolio of properties exceeded its $8.1 million fair value at the time of the acquisition by approximately $19 million (or 234%), which IIPR failed to record as an advance to Kings Garden and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

115.     On March 11, 2020, IIPR acquired a 373,000 sq. ft. property from Parallel in Wimauma, Florida for $35.3 million. Using the most recent sale data for the underlying property cited in the Report, and assuming a 5% per annum property price appreciation (same as in the Report) indicates that IIPR's total purchase price for this property exceeded its $10.4 million fair value at the time of the acquisition by approximately $24.9 million (or 239%), which IIPR failed to record as an advance to Parallel and instead included in the cost of IIPR's real estate assets in

violation of ASC 842.

116.    On May 12, 2020, IIPR acquired a 70,000 sq. ft. property at 19533 Mclane Street in Palm Springs, CA from Kings Garden for $17.5 million. According to the data cited in the Report, Kings Garden purchased this property for $3.75 million three years earlier and also made $1.1 million worth of improvements to it. Using this data and assuming a 5% per annum property price appreciation (same as in the Report), indicates that IIPR's total purchase price for this property exceeded its $5.6 million fair value at the time of the acquisition by approximately $11.9 million (or 212%), which IIPR failed to record as an advance to Kings Garden and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

117.    On September 18, 2020, IIPR acquired a 220,000 sq. ft. property from Parallel in Lakeland, Florida for $19.6 million. Using the most recent sale data for the underlying property cited in the Report, and assuming a 5% per annum property price appreciation (same as in the Report) indicates that IIPR's total purchase price for this property exceeded its $3.9 million fair value at the time of the acquisition by approximately $15.7 million (or 405%), which IIPR failed to record as an advance to Parallel and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

118.    On May 7, 2021, IIPR acquired a 239,000 sq. ft. property from Parallel in Pittsburgh, PA for $41.8 million. However, as noted in the Report, Parallel had purchased this property for only $22 million on May 6, 2021, just one day prior to flipping it to IIPR for a 90% markup, which IIPR failed to record as an advance to Parallel and instead included in the cost of IIPR's real estate assets in violation of ASC 842.

**FALSE AND MISLEADING STATEMENTS AND OMISSIONS ISSUED BY IIIPR DURING THE RELEVANT PERIOD**

119.    The Individual Defendants incorporated by reference, in their entirety, the risk

factors from their Annual Report on Form 10-K for the period ended December 31, 2019, filed

with the SEC on March 2, 2020 ("2019 10-K") into their Q2 2020 10-Q for the period ended June

30, 2020. Thus, in the Q2 2020 10-Q, by reference, the Individual Defendants warned that:

> the success of our investments will be materially dependent on the financial stability
> of these tenants." They continued, "[w]e rely on our management team to perform
> due diligence investigations of our potential tenants, related guarantors and their
> properties, operations and prospects, of which there is generally little or no publicly
> available operating and financial information." In addition, they warned, that they
> "may not learn all of the material information we need to know regarding these
> businesses through our investigations, and these businesses are subject to numerous
> risks and uncertainties, including but not limited to regulatory risks and the rapidly
> evolving market dynamics of each state's regulated cannabis program. As a result,"
> they concluded, "it is possible that we could enter into a sale-leaseback arrangement
> with tenants or otherwise lease properties to tenants that ultimately are unable to
> pay rent to us, which could adversely impact our cash available for distributions.

120.    With respect to risk management the Q2 2020 10-Q includes the 2019 10-K

disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing

basis by reviewing, where available, the publicly filed financial reports, press releases and other

publicly available industry information regarding our tenants and any guarantors." The Individual

Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants

and, in some instances, we monitor our tenants by periodically conducting site visits and meeting

with the tenants to discuss their operations," concluding that "[i]n many instances, we will

generally not be entitled to financial results or other credit-related data from our tenants."

121.    After claiming to have carefully reviewed their tenants both initially and on an

ongoing basis, in the Q2 2020 10-Q, the Individual Defendants disclosed, for the first time, IIPR's

relationship with Kings Garden. Including more robust disclosure about their credit concentration

risk, the Q2 2020 10-Q claims that for the three months ended June 30, 2019, Kings Garden had

five leases with IIPR that comprised 10% of IIPR's Rental Revenue and that as of May 12, 2020,

IIPR had acquired properties affiliated with Kings Garden representing 70,000 rentable square feet

for $17.5 million.

122. During Defendants' August 6, 2020, Earnings Conference Call ("Q2 2020 Call"), Defendant Gold boasted of $225 million in second quarter 2020 acquisitions, including "follow-on transactions" with Kings Garden. Defendant Regin continued about California acquisitions, describing that "[i]n May, we acquired a 70,000-square-foot industrial property in Southern California for $17.5 million and entered into a long-term lease with Kings Garden." According to Defendant Regin, with that acquisition, IIPR "leased 5 properties to Kings Garden . . . totaling 102,000 square feet that we acquired in April of last year." Defendant Regin continued "Kings Garden is a leading cannabis cultivation, processing and manufacturing operator, having developed a tremendous brand and reputation for consistent top-shelf quality," concluding that "[n]otably and highly unique in this industry, Kings Garden declared its first quarterly dividend in June of this year to its equity investors."

123. The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a) The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information; and

(b) Upon disclosing the investments in Kings Garden, and its contribution to

rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

124.    On August 5, 2020, the Individual Defendants issued a press release, titled, "Innovative Industrial Properties Reports Second Quarter Results, Investments Drive 183% Total Revenues, 322% Q2 Net Income and 263% Q2 AFFO Growth Year-over-Year." In the Q2 2020 10-Q, and in the August 5, 2020, press release, the Individual Defendants included IIPR's financial results. The Company reported net real estate held for investment at the end of the quarter of approximately $791.6 million, quarterly revenues of approximately $24.3 million and income from operations of approximately 13.6 million.

125.    The foregoing was materially false and/or misleading for the following reasons:

(a)    In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(b)    In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants;

(d)    As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $54.2 million (or 7.4%), and failed to report the approximately $55.1 million balance of advances to Parallel and Kings

Garden on IIPR's balance sheet at the end of Q2 2020; and

(e)     As a result of these GAAP violations, the Individual Defendants overstated IIPR's Q2 2020 quarterly revenues by approximately $1.2 million (or 5.1%) and operating income by $558,000 (or 4.1%).

126.    On November 5, 2020, the Individual Defendants filed with the SEC their Q3 2020 10-Q for the period ended September 30, 2020 and incorporated into the Q3 2020 10-Q, by reference, in their entirety, the risk factors from their 2019 10-K. Thus, in the Q3 2020 10-Q, by reference, the Individual Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

127.    With respect to risk management the Q3 2020 10-Q includes the 2019 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants

and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

128.    Against this backdrop, claiming to have carefully evaluated their tenants both initially and on an ongoing basis, in the Q2 2020 10-Q, the Individual Defendants reiterated IIPR's relationship with Kings Garden. Including more robust disclosure about their credit concentration risk, the Q2 2020 10-Q shows that for the three months ended June 30, 2019, Kings Garden had five leases with IIPR that comprised 10% of IIPR's Rental Revenue and that as of May 12, 2020, IIPR had acquired properties affiliated with Kings Garden representing 70,000 rentable square feet for $17.5 million.

129.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already

47

submitted material forged and fraudulent Draw Requests and invoices.

130.     On November 5, 2020, the Individual Defendants issued a press release, titled, "Innovative Industrial Properties Reports Third Quarter 2020 Results, Investments Drive 197% Q3 Total Revenues, 205% Q3 Net Income and 192% Q3 AFFO Growth Year-over-Year." In the Q3 2020 10-Q, and in the November 5, 2020, press release, the Individual Defendants included IIPR's Financial Results. The Company reported net real estate held for investment at the end of the quarter of approximately $885.0 million, quarterly revenues of approximately $34.3 million, and income from operations of approximately $20.4 million.

131.     The foregoing was materially false and/or misleading for the following reasons:

(a)     In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale- leaseback transactions with these tenants;

(b)     In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)     In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants;

(d)     As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $69.2 million  (or 8.5%) and failed to report the approximately $70.5 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q3 2020; and

(e)     As a result of these GAAP violations, the Individual Defendants overstated

IIPR's Q3 2020 quarterly revenues by approximately $1.4 million (or 4.1%) and operating income by $641,000 (or 3.2%).

132.    On February 24, 2021, the Individual Defendants issue a press release, disclosing IIPR's financial results for the year ended December 31, 2020. About investment and leasing activity, the Individual Defendants disclosed that in the fourth quarter of 2020, IIPR acquired four new properties and financed additional land expansion in a fifth, totaling 848,000 rentable square feet for an aggregate of $254.1 million. According to the Individual Defendants, they expanded an existing tenant relationship with Kings Garden, among others.

133.    On February 26, 2021, IIPR's 2020 10-K was filed with the SEC and was signed by Defendants Smithers, Hastings, Bui, Gold, Kreitzer, Curran, Stecher, and Shoemaker. The Individual Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." The 2020 10-K continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, the 2020 10-K warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," the 2020 10-K concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

134.    With respect to risk management the 2020 10-K disclosed that "[w]e evaluate the

Case 1:23-cv-00737-GLR   Document 1   Filed 03/17/23   Page 50 of 92

credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

135.     About Kings Garden, the 2020 10-K disclosed that as of December 31, 2020, Kings Garden accounted for the second most rentable square feet in IIPR's portfolio for the largest single investment in any tenant of nearly $70 million, including "four properties acquired on April 16, 2019, one property acquired on May 12, 2020, consisting of 70,000 square feet for a purchase price of $17.5 million, and one property acquired on November 16, 2020," consisting of 192,000 rentable square feet for an initial purchase price of $17.5 million. These amounts exclude "available tenant improvement allowance of $25.0 million." In addition, under "subsequent events," the 2020 10-K disclosed that on February 5, 2021, IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million. As of February 24, 2021, we had not funded any of the tenant improvement allowance."

136.     The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact,

from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)      Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

137.    On February 25, 2021, IIPR issued a press release regarding its financial results for the fourth quarter of 2020 and year ended December 31, 2020. IIPR reported net real estate held for investment at the end of the year of approximately $1.0 billion, annual revenues of approximately $116.9 million, income from operations of approximately $69.7 million, net income attributable to common stockholders of approximately $64.4 million, and net income attributable to common stockholders per diluted share of $3.27.

138.    The foregoing was materially false and/or misleading for the following reasons:

(a)      In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale- leaseback transactions with these tenants;

(b)      In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)      In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants;

(d)      In violation of ASC 360 failed to record a $4.0 million impairment of the Parallel properties;

(e)      As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $72.3 million (or 7.6%) and failed to report the approximately $70.1 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of 2020; and

(f)      As a result of these GAAP violations, the Individual Defendants overstated IIPR's 2020 annual revenues by approximately $4.8 million (or 4.3%), operating income by approximately $6.2 million (or 9.8%), net income attributable to common stockholders by approximately $2.6 million (or 4.2%), and net income attributable to common stockholders per diluted share by $0.14 (or 4.5%).

139.    On February 25, 2021, the Individual Defendants convened an Earnings Conference Call ("Q4 2020 Call"). Defendant Regin described the fourth quarter acquisitions, "touch[ing] on each . . . by state and also provid[ing] some information about each tenant and our portfolio overall in the state." About Kings Garden, he stated, "[w]e have been fairly active in California in recent months with our 2 transactions with Kings Garden…" He continued that in California's robust cannabis market "Kings Garden is one of the top operators . . ., consistently ranking in the top 5 of flower and concentrate sales in the state," continuing that Kings Garden "was one of the first cannabis operators to commence regular quarterly dividends to its shareholders in June 2020, a remarkable achievement for a company continuing on its rapid

expansion path." Defendants Regin noted that IIPR now leased six properties to Kings Garden, "representing well over 0.5 million square feet, including projects under development and a total investment of nearly $150 million, including commitments to fund future development and redevelopment." He expressed that IIPR were "proud partners of King and his great team and look forward to supporting them through the development and redevelopment of state-of-the-art facilities to dramatically expand production capacity and continue to deliver the highest-quality product that they are known for." Later in the Q4 2020 Call, Defendant Regin stated that IIPR was "thrilled to team with Kings Garden in California, one of the top operators in the largest regulated cannabis market in the world."

140.    Similarly, during the Q4 2020 Call, in response to analysts' questions, Defendant Gold stated that "we tend to add new growers very carefully and with a lot of consideration because of that commitment to be able to provide them future capital" and with respect to yields from deals with new tenants versus existing tenants, "[w]e evaluate and underwrite every single one of our transactions individually. We underwrite the quality of the tenant, the quality of the location, the deal terms and the complexity of the transaction," creating what IIPR "think[s] is an appropriate yield for the capital that we intend to offer."

141.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence

53

investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed;

(b)     Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; and

(c)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

142.     On April 19, 2021, Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker reviewed, approved, and caused the Company to file a Proxy Statement (the "2021 Proxy" or "2021 Annual Proxy").

143.     In the 2021 Annual Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker; and (2) to approve the Company's executive compensation on an advisory basis.

144.     In discussing the Individual Defendants, the 2021 Proxy stated that Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker all had "Risk oversight experience" in a section titled "Information Regarding Nominees." The section further provided that Kreitzer and Smithers had "strong regulatory and legal knowledge" and Kreitzer and Gold had "extensive commercial real estate experience."

145.     With respect to the role of the Directors with respect to Risk Management, the 2021

Proxy stated:

> Our Board plays an active role in overseeing the management of our risks. The committees of our Board assist our full Board in risk oversight by addressing specific matters within the purview of each committee. The audit committee focuses on oversight of financial risks; the compensation committee focuses primarily on risks relating to executive compensation plans and arrangements; and the nominating and corporate governance committee focuses on reputational and corporate governance risks, including the independence of our Board. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our full Board keeps itself regularly informed regarding such risks, including through committee reports.

146.   The 2021 Proxy also stated the following: "Our directors, officers, and other employees are subject to a Code of Business Conduct and Ethics."

147.   The above statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in IIPR's compliance and financial reporting; and (ii) was unaware of existing material risks that could affect the Company.

148.   The 2021 Proxy omitted any disclosures regarding the adverse facts specified herein. As detailed herein, the Board, at the time they approved the 2021 Proxy, knew that they had not adequately investigated King and King's Garden which put the Company at material risk, and yet wrongfully failed to disclose this information to shareholders.

149.   On June 4, 2021, IIPR's shareholders voted to approve each of the proposals in the 2021 Proxy.

150.   The 2021 Proxy harmed IIPR by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting IIPR. As a result of the false or misleading statements in the 2021 Proxy, IIPR stockholders voted to re-elect Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker to the Board.

151.   The 2021 Proxy also urged stockholders to approve an advisory resolution

regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2021 Proxy said:

> In an effort to align the interests of management with those of our stockholders, our compensation program focuses on pay-for-performance principles that focus on the achievement of both short-term and long-term financial and operational metrics. Our compensation mix rewards the continued performance of the Company, encourages a disciplined approach to management, and maintains focus on the creation of long-term value for our stockholders. We believe this structure is competitive and allows us to attract, motivate, and retain highly qualified executive officers.

> In connection with reviewing our compensation program and the 2020 compensation paid to our named executive officers, it is important to consider the Company's exceptional performance results achieved during 2020 as well as our total stockholder performance across multiple periods.

152.    Those statements in the 2021 Annual Proxy conveyed the impression that IIPR's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, IIPR's compensation system actually encouraged, and consistently rewarded improper behavior. Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker knew that executives had breached their fiduciary duties to the Company by failing to adequately investigate King and Kings Garden and that there were inadequate internal controls over financial reporting which exposed the Company to significant and material risks and liability through their conduct.

153.    As a result of the false and misleading statements in the 2021 Proxy, IIPR's stockholders voted to approve the proposals in the 2021 Proxy. Had the IIPR shareholders been fully informed about the true operations at IIPR, they would not have voted to re-elect the directors and would not have voted to approve the Company's executive compensation program on an advisory basis.

154.    On May 5, 2021, the Individual Defendants issued a press release titled "Innovative

Industrial Properties Reports First Quarter 2021 Results, Acquisitions and Portfolio Performance Drive Q1 Y-O-Y Growth of 103% in Total Revenues, 122% in Net Income and 116% in AFFO." The May 5, 2021, press release stated that:

> "[f]rom January 1, 2021 through today, made four acquisitions (including three new properties and additional land expansion at an existing property) for properties located in California, Florida, Michigan and Texas; and executed three lease amendments to provide additional tenant improvements at properties located in Michigan, New York and Pennsylvania. In January 2021, executed a new long-term lease with Holistic Industries Inc. (Holistic) for IIP's Los Angeles, California property, bringing IIP's property portfolio to 100% leased. In these transactions, established a new tenant relationship with Harvest Health & Recreation Inc., while expanding existing relationships with Green Peak Industries, LLC (Skymint), Holistic, Jushi Holdings Inc., Kings Garden Inc., LivWell Holdings, Inc., Parallel and PharmaCann Inc.

155.    On May 6, 2021, the Individual Defendants filed IIPR's Q1 2021 10-Q. The Individual Defendants incorporated by reference the risk disclosures from the 2020 10-K, warning that, "the success of our investments will be materially dependent on the financial stability of these tenants." The Q1 2021 10-Q continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, the Q1 2021 10-Q warned, that IIPR "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," the Q1 2021 10-Q concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

156.    With respect to risk management, reiterating the 2020 10-K's disclosure, the Q1

2021 10-Q stated, "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

157.    About Kings Garden, the Q1 2021 10-Q disclosed that during the quarter ended March 31, 2021, IIPR had acquired three properties, including one from Kings Garden. The Q1 2021 10-Q repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million."

158.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)      Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

159.    On May 5, 2021, IIPR issued a press release regarding its financial results for Q1 2021 and on May 6, 2021, the Company filed its Q1 2021 10-Q, for the period ended March 31, 2021. In both documents the Individual Defendants disclosed Q1's financial results. IIPR reported net real estate held for investment at the end of the quarter of approximately $1.1 billion, revenues of approximately $42.9 million, and income from operations of approximately $27.7 million.

160.    The foregoing was materially false and/or misleading for the following reasons:

(a)      In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale- leaseback transactions with these tenants;

(b)      In violation of GAAP provision ASC 842 improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)      In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants.

(d)      In violation of GAAP provision ASC 360, failed to timely record a $4.0 million impairment of the Parallel properties;

(e)      As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $71.4 million (or 6.7%) and

failed to report the approximately $69.7 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q1 2021; and

(f)     As a result of these GAAP violations, the Individual Defendants overstated IIPR's Q1 2021 quarterly revenues by approximately $1.7 million (or 4.1%) and operating income by $792,000 (or 2.9%).

161.    On August 5, 2021, the Individual Defendants filed with the SEC IIPR's Q2 2021 10-Q, its Quarterly Report for the period ended June 30, 2021. The Individual Defendants incorporated relevant risk warnings from the 2020 10-K, warning that, "the success of our investments will be materially dependent on the financial stability of these tenants." The Q2 2021 10-Q continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, the Q2 2021 10-Q warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," the Q2 2021 10-Q concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

162.    With respect to risk management, the Q2 2021 10-Q incorporated the 2020 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual

Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

163.    About Kings Garden, the Q2 2021 10-Q repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million." With respect to "Concentration of Credit Risk," the Individual Defendants stated that Kings Garden was among the top five contributors to IIPR revenue, accounting for 7% of total rental revenue for the three months ended June 30, 2021.

164.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)      The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations  and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)      Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King

and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

165.   On August 5, 2021, the Company's Q2 2021 call was held. Discussing IIPR's "most significant tenants," Defendant Regin stated that Kings Garden, "represent[ed] a total commitment of nearly $150 million and which is expected to encompass over 500,000 square feet of space upon completion of development and redevelopment at certain properties." He continued that "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world." More specifically, Defendant Regin noted, "[w]ith production of 40,000 pounds of cannabis flower annually and continuing to ramp significantly, it is the leading top- quality producer in the state." Defendant Regin boasted of Kings Garden's recycling, water reclamation, and environmentally friendly power efforts. He concluded, "[w]e highlighted a number of environmental initiatives of our tenant partners in their operations and our inaugural ESG report posted to our website. And Kings Garden is yet another example of our tenant partners focused on long-term, responsible, sustainable production."

166.   During the Q2 2021 Call, Defendant Gold referred to tenants like Kings Garden, stating "we are thrilled with the quality of our tenant roster and the continued demonstrated strength and resilience of our tenant partners and their execution on operations." Similarly, Defendant Hastings stated, "As Ben previously mentioned, we've been proud to continue to partner with many of our tenant operators and amend the leases to provide for additional expansion capital at our facilities for a corresponding increase in base rent."

167.   The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information;

(b)     Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; and

(c)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

168.    On August 4, 2021, the Individual Defendants issued a press release titled, "Innovative Industrial Properties Reports Second Quarter 2021 Results, Investments and Portfolio Performance Drive Q2 Y-O-Y Growth of 101% in Total Revenues, 124% in Net Income and 104% in AFFO." In the August 4, 2021, press release and in the Q2 2021 10-Q, the Individual Defendants included IIPR's Financial Results. IIPR reported net real estate held for investment at the end of the quarter of approximately $1.3 billion, revenues of approximately $48.9 million, and income from operations of approximately $32.9 million.

169.     The foregoing was materially false and/or misleading for the following reasons:

(a)     In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale- leaseback transactions with these tenants;

(b)     In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)     In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants;

(d)     In violation of GAAP provision ASC 360, failed to timely record a $4.0 million impairment of the Parallel properties;

(e)     As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $90.1 million (or 7.6%) and failed to report the approximately $88.9 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q2 2021; and

(f)     As a result of these GAAP violations, the Individual Defendants overstated IIPR's Q2 2021 quarterly revenues by approximately $1.9 million (or 4.1%) and operating income by $908,000 (or 2.8%).

170.     On November 4, 2021, the Individual Defendants filed with the SEC IIPR's Q3 2021 10-Q for the period ended September 30, 2021. The Individual Defendants incorporated relevant risk warnings from the 2020 10-K, warning that, "the success of our investments will be materially dependent on the financial stability of these tenants." The Q3 2021 10-Q continued,

"[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, the Q3 2021 10-Q warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," the Q3 2021 10-Q concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

171.    With respect to risk management, the Q3 2021 10-Q incorporated the 2020 10-K disclosure that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

172.    About Kings Garden, the Q3 2021 10-Q repeated the details of the February 5, 2021, transaction in which IIPR lent $1.35 million to purchase land on which Kings Garden purportedly agreed to build two buildings of a combined 180,000 rentable square feet "for which [IIPR] agreed to provide reimbursement of up to approximately $51.4 million." With respect to "Concentration of Credit Risk," the Individual Defendants stated, that Kings Garden was among

the top five contributors to IIPR revenue, accounting for 8% of rental revenue for the three months ended September 30, 2021.

173.     The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individua Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

174.     On November 3, 2021, IIPR issued a press release regarding its financial results for Q3 2021. On November 4, 2021, the Company filed its Q3 2021 10-Q, for the period ended September 30, 2021. In both filings the Individual Defendants reported net real estate held for investment at the end of the quarter of approximately $1.4 billion, revenues of approximately $53.9 million, and income from operations of approximately $36.3 million.

175.     The foregoing was materially false and/or misleading for the following reasons:

(a)     In violation of GAAP provision ASC 842, failed to record the advances

66

IIPR made to Parallel and Kings Garden in connection with sale- leaseback transactions with these tenants;

      (b)    In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

      (c)    In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants;

      (d)    In violation of GAAP provisions ASC 360, failed to timely record a $4.0 million impairment of the Parallel properties;

      (e)    As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $90.0 million (or 6.8%) and failed to report the approximately $88.4 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of Q3 2021; and

      (f)    As a result of these GAAP violations, the Individual Defendants overstated IIPR's Q3 2021 quarterly revenues by approximately $2.2 million (or 4.2%) and operating income by approximately $1.0 million (or 2.9%).

      176.    On February 24, 2022, the Individual Defendants filed the 2021 10-K, for the year ended December 31, 2021 signed by Defendants Smithers, Hastings, Bui, Gold, Kreitzer, Curran, Stecher, and Shoemaker. The Individual Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." They continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no

publicly available operating and financial information." In addition, they warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each state's regulated cannabis program. As a result," they concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

177.    With respect to risk management the 2021 10-K disclosed that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

178.    About "Tenant Concentration," the 2021 10-K disclosed that as of December 31, 2021, Kings Garden was among the "five tenants in our property portfolio that represented the largest percentage of our total rental revenue," itself contributing 8% of rental revenue. The 2021 10-K also notes that as of December 31, 2021, Kings Garden was the tenant with the second great total square footage with 544,000 and the largest of IIPR's investments with over $82 million invested plus "remaining aggregate improvement allowances at certain properties totaling approximately $65.0 million."

179.    The foregoing was false and misleading because, for the reasons stated above, the

Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

180.    About tenants, including Kings Garden, the 2021 10-K warned:

Because we lease our properties to a limited number of tenants, and to the extent we depend on a limited number of tenants in the future, the inability of any single tenant to make its lease payments could adversely affect our business and our ability to make distributions to our stockholders. As of December 31, 2021, we owned 103 total properties. Five of our tenants, PharmaCann Inc. (at five of our properties), Parallel (at four of our properties), Ascend Wellness Holdings, Inc. (at three of our properties), Cresco Labs Inc. (at five of our properties) and Kings Garden Inc. (at six of our properties), represented approximately 12%, 10%, 9%, 8% and 8%, respectively, of our rental revenues (including tenant reimbursements) for the year ended December 31, 2021. Lease payment defaults by any of our tenants or a significant decline in the value of any single property would materially adversely affect our business, financial position and results of operations, including our ability to make distributions to our stockholders. Our lack of diversification also increases the potential that a single underperforming investment or tenant could have a material adverse effect on our cash flows and the price we could realize from the sale of our properties. Any adverse change in the financial condition of any of our tenants, including but not limited to the state cannabis markets not developing and growing in ways that we or our tenants projected, or any adverse change in the

69

political climate regarding cannabis where our properties are located, would subject us to a significant risk of loss.

In addition, failure by any of our tenants to comply with the terms of its lease agreement with us could require us to find another lessee for the applicable property. We may experience delays in enforcing our rights as landlord and may incur substantial costs in protecting our investment and re-leasing that property. Furthermore, we cannot assure you that we will be able to re-lease that property for the rent we currently receive, or at all, or that a lease termination would not result in our having to sell the property at a loss. The result of any of the foregoing risks could materially and adversely affect our business, financial condition and results of operations and our ability to make distributions to our stockholders.

181.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)    Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

182.    On February 23, 2022, IIPR issued a press release regarding its financial results for Q4 2021 and for the year ended December 31, 2021. On February 24, 2022, the Company filed its 2021 10-K, for the period ended December 31, 2021. In both filings, IIPR reported that net real

estate held for investment at the end of the year of approximately $1.64 billion, annual revenues of approximately $204.6 million, income from operations of approximately $135.4 million, net income attributable to common stockholders of approximately $112.6 million, and net income attributable to common stockholders per diluted share of $4.55.

183.    The foregoing was materially false and/or misleading for the following reasons:

(a)     In violation of GAAP provision ASC 842, failed to record the advances IIPR made to Parallel and Kings Garden in connection with sale- leaseback transactions with these tenants;

(b)     In violation of GAAP provision ASC 842, improperly included in the cost of IIPR's real estate assets the advances IIPR made to Parallel and Kings Garden in connection with sale-leaseback transactions with these tenants;

(c)     In violation of GAAP provision ASC 842, failed to allocate any portion of lease payments IIPR received from Kings Garden or Parallel to debt service on advances IIPR made to these tenants in connection with sale- leaseback transactions with these tenants;

(d)     In violation of GAAP provision ASC 360, failed to record a $42.5 million impairment of the Parallel properties;

(e)     In violation of GAAP provision ASC 360, failed to record a $6.3 million impairment of the Kings Garden properties;

(f)     As a result of these GAAP violations, the Individual Defendants overstated IIPR's net real estate held for investment balance by approximately $132.7 million (or 8.8%) and failed to report the approximately $87.8 million balance of advances to Parallel and Kings Garden on IIPR's balance sheet at the end of 2021; and

(g)     As a result of these GAAP violations, the Individual Defendants overstated

IIPR's 2021 annual revenues by approximately $7.9 million (or 4.0%), operating income by approximately $48.6 million (or 56.1%), net income attributable to common stockholders by approximately $42.7 million (or 61.0%), and net income attributable to common stockholders per diluted share by $1.62 (or 55.3%).

184.   On February 24, 2022, IIPR held an Earnings Conference Call ("Q4 2021 Call"). Defendant Regin discussed IIPR's top ten operators, including Kings Garden. He described Kings Garden as "a tenant partner . . . across 6 properties in Southern California, representing a total commitment of about $148 million and which is expected to encompass over 500,000 square feet of space upon completion of development and redevelopment at certain properties." Defendant Regin continued that "Kings Garden has developed a truly distinguished brand in California and consistently ranks as a top producer in sales in a state that represents the largest market in the world." He noted that upon completing its facilities, Kings Garden "expect[ed] . . . generat[e] approximately 140,000 pounds to 150,000 pounds of finished cannabis per year in addition to concentrates." Defendant Regin continued, "[w]ith their brand reputation and operational expertise driving financial results, the Kings Garden team has also been one of the uniquely positioned operators to return capital to its long-term owners in the form of dividends, including $3 million in each of the last 2 years," concluding, "[w]e are excited to be working closely with Kings Garden as they complete full build-out of their production capacity in the months to come."

185.   The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material

forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information, as claimed;

(b)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; and

(c)     Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

186.    On April 7, 2022, Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker reviewed, approved, and caused the Company to file a Proxy Statement (the "2022 Proxy" or "2022 Annual Proxy").

187.    In the 2022 Annual Proxy, the Board sought shareholder approval for, *inter alia,* (1) the re-election of Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker; and (2) to approve the Company's executive compensation on an advisory basis.

188.    In discussing the Individual Defendants, the 2022 Proxy stated that Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker all had "Risk oversight experience" in a section titled "Information Regarding Nominees." The section further provided that Kreitzer and Smithers had "strong regulatory and legal knowledge" and Kreitzer and Gold had "extensive

commercial real estate experience."

189.    With respect to the role of the Directors with respect to Risk Management, the 2022

Proxy stated:

> Our Board plays an active role in overseeing the management of our risks. The committees of our Board assist our full Board in risk oversight by addressing specific matters within the purview of each committee. The audit committee focuses on oversight of financial risks; the compensation committee focuses primarily on risks relating to executive compensation plans and arrangements; and the nominating and corporate governance committee focuses on reputational and corporate governance risks, including the independence of our Board. While each committee is responsible for evaluating certain risks and overseeing the management of such risks, our full Board keeps itself regularly informed regarding such risks, including through committee reports.

190.    The 2022 Proxy also stated the following: "Our directors, officers, and other employees are subject to a Code of Business Conduct and Ethics."

191.    The above statements conveyed that the Board (i) maintained sufficient compliance, risk controls, review, and reporting programs to identify and address deficiencies in IIPR's compliance and financial reporting; and (ii) was unaware of existing material risks that could affect the Company.

192.    The 2022 Proxy omitted any disclosures regarding the adverse facts specified herein. As detailed herein, the Board, at the time they approved the 2022 Proxy, had knowledge of, among other things, that they had not adequately investigated King and King's Garden which put the Company at material risk, and yet wrongfully failed to disclose this information to shareholders.

193.    On May 18, 2022, IIPR's shareholders voted to approve each of the proposals in the 2022 Proxy.

194.    The 2022 Proxy harmed IIPR by interfering with its shareholders' right to cast a fully informed vote regarding critical governance issues affecting IIPR. As a result of the false or

misleading statements in the 2022 Proxy, IIPR stockholders voted to re-elect Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker to the Board.

195.    The 2022 Proxy also urged stockholders to approve an advisory resolution regarding compensation paid to named executives. In support of the requested approval, in addition to the statements quoted above, the 2022 Proxy said:

> In an effort to align the interests of management with those of our stockholders, our compensation program focuses on pay-for-performance principles that focus on the achievement of both short-term and long-term financial and operational metrics. Our compensation mix rewards the continued performance of the Company, encourages a disciplined approach to management, and maintains focus on the creation of long-term value for our stockholders. We believe this structure is competitive and allows us to attract, motivate, and retain highly qualified executive officers.
>
> In connection with reviewing our compensation program and the 2021 compensation paid to our named executive officers, it is important to consider the Company's exceptional performance results achieved during 2021 as well as our total stockholder performance across multiple periods.

196.    Those statements in the 2022 Annual Proxy conveyed the impression that IIPR's compensation system encouraged proper performance-based compensation and advanced long-term stockholder value. In reality, IIPR's compensation system actually encouraged, and consistently rewarded improper behavior. Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker knew that executives had breached their fiduciary duties to the Company by failing to adequately investigate King and Kings Garden and that there were inadequate internal controls over financial reporting which exposed the Company to significant and material risks and liability through their conduct.

197.    As a result of the false and misleading statements in the 2022 Proxy, IIPR's stockholders voted to approve the proposals in the 2022 Proxy. Had the IIPR shareholders been fully informed about the true operations at IIPR, they would not have voted to re-elect the directors

and would not have voted to approve the Company's executive compensation program on an advisory basis.

## THE TRUTH BEGINS TO EMERGE

198.   On April 14, 2022, before the market opened, the Report was released which as discussed above, revealed, among other things, the fraud lawsuits filed against King and Kings Garden and that IIPR was overvaluing the fair value of it purchases in its financial statements.

199.   On this disclosure IIPR's stock fell by 7.5%, falling from $183.44 at the close of trading on April 13, 2022, to close at $169.68 on April 14, 2022, damaging investors.

200.   Before the market closed on April 14, 2022, IIPR announced that it was "aware of a short-seller report (...) that contains numerous false and misleading statements about [IIRP]." "This short-seller report is flawed and demonstrates a basic lack of understanding of commercial real estate generally, the regulated cannabis industry, and IIPR's straightforward, simple business model," stated the the Company in a press release. The Company further stated, "This short-seller fails to have any comprehension of the scope of significant infrastructure improvements that are needed for the transformation of a standard industrial building to a mission-critical facility with the enhanced environmental controls and other building systems necessary for regulated cannabis cultivation and processing. In addition, the writers do not understand the process that IIPR employs for underwriting those improvements, and that any IIPR reimbursements relate only to verified, qualified improvements to the buildings for these purposes, and never as funding for any type of "loan" to be utilized for any other purpose," added the Company. "Given the flawed nature and disinformation contained in this short-seller report, other than the clarification set forth above, the short-seller report's content does not warrant a response from IIPR," concluded the Company.

201.   The foregoing was false and misleading because, for the reasons stated above, the

Individual Defendants recklessly disregarded but had a duty to disclose that:

(a)     The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed; and

(b)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

202.    On May 5, 2022, the Individual Defendants filed with the SEC IIPR's Q1 2022 10-Q for the period ended March 31, 2021. Incorporating by reference the 2021 10-K's risk factors, the Individual Defendants warned that, "the success of our investments will be materially dependent on the financial stability of these tenants." The 2022 10-Q continued, "[w]e rely on our management team to perform due diligence investigations of our potential tenants, related guarantors and their properties, operations and prospects, of which there is generally little or no publicly available operating and financial information." In addition, the 2022 10-Q warned, that they "may not learn all of the material information we need to know regarding these businesses through our investigations, and these businesses are subject to numerous risks and uncertainties, including but not limited to regulatory risks and the rapidly evolving market dynamics of each

state's regulated cannabis program. As a result," the 2022 10-Q concluded, "it is possible that we could enter into a sale-leaseback arrangement with tenants or otherwise lease properties to tenants that ultimately are unable to pay rent to us, which could adversely impact our cash available for distributions."

203.    With respect to risk management, incorporating 2021 10-K risk factors, the Q1 2022 10-Q disclosed that "[w]e evaluate the credit quality of our tenants and any guarantors on an ongoing basis by reviewing, where available, the publicly filed financial reports, press releases and other publicly available industry information regarding our tenants and any guarantors." The Individual Defendants continued that,"[i]n addition, we monitor the payment history data for all of our tenants and, in some instances, we monitor our tenants by periodically conducting site visits and meeting with the tenants to discuss their operations," concluding that "[i]n many instances, we will generally not be entitled to financial results or other credit-related data from our tenants."

204.    About "Concentration of Credit Risk," the Q1 2022 10-Q disclosed that as of March 31, 2022, Kings Garden was among the "five tenants in our property portfolio that represented the largest percentage of our total rental revenue," contributing 8% of rental revenue. The Q1 2022 10-Q also notes that for the quarter ended March 31, 2022, IIPR had invested another $8 million in another Kings Garden property with 23,000 rentable square feet.

205.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify.

Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors *on an ongoing basis*" by reviewing publicly filed information, as claimed;

(b)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; and

(c)     Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

206.    During their May 5, 2022, Earnings Conference Call ("Q1 2022 Call") Defendant Regin stated:

> We made our initial investment with Kings Garden in April 2019, acquiring a 5-property portfolio in Southern California, consisting of approximately 102,000 square feet of industrial space, all of which was operational at the time of our acquisition for approximately $27 million or roughly $266 per square foot. At that time, we evaluated Kings Garden, as a leading indoor cannabis operator in California with profitable operations and a distribution agreement with one of the largest distributors in the state, delivering Kings Garden products to over 60% of the state's regulated dispensaries.
>
> In May of 2020, we followed with the acquisition of a fully operational property comprised of approximately 70,000 square feet of industrial space for $17.5 million or $250 per square foot. Shortly after that closing, Kings Garden announced the initiation of a quarterly dividend to its stockholders, something that was and is considered highly unusual among any prominent brand in the industry and which demonstrates their belief in the long-term prospects in the business. In November of 2020, we made another investment with Kings Garden agreeing to purchase 192,000 square foot building from a third party in San Bernardino for approximately $25 million or approximately $130 per square foot. And to provide

reimbursement to Kings Garden for improvements at that facility of another $25 million for key infrastructure requirements for the regulated cannabis cultivation or another $130 per square foot, such that our total investment in the facility was expected to be $260 per square foot. In February 2021, we acquired 3.5 acres adjacent to one of our first acquisitions with Kings Garden for approximately $1.4 million, amending the lease for that property and providing for reimbursement to Kings Garden up to $51.4 million for the construction of 2 brand-new facilities totaling 180,000 square feet of space or about $285 per square foot. At that time, Kings Garden was projected to have approximately 665,000 square feet of indoor operations and over $300 million in revenue starting in 2024. With the expectation that upon completion of all facilities under development or redevelopment that Kings Garden would be producing approximately 140,000 pounds of finished cannabis product annually in California. Finally, earlier this year, we acquired a 23,000 square foot facility in Cathedral City for $8.2 million, equating to about $353 per square foot. The single-story building is being renovated from office space to a fully operational cultivation facility with a holdback in the purchase price to the seller until the seller completes the final improvements. Kings Garden continues to be one of the largest indoor cultivation operators in California with 3,400 flowering lights producing in [excess] of 36,000 pounds of indoor flower annually, which does not include at all the approximately 395,000 square feet of projects slated to come online in the coming months, as Griffin will discuss. I'll pass along to Griffin to discuss our Kings Garden property portfolio. Griffin?

207.    During that same Q1 2022 Call, about Kings Garden, Griffin Marquart, IIPR's

Director of Construction Management stated:

As Ben mentioned, we have a number of properties leased to Kings Garden. Of that portfolio, 6 properties comprising of approximately 172,000 square feet are operational with no additional improvements in process. Of the properties under development or redevelopment, I will touch on those individually. In San Bernardino, the 192,000 square foot project is located on approximately 7 acres. As Ben mentioned, our base cost for the industrial building was roughly $130 per square foot, and we have provided an improvement in allowance of an additional $130 per square foot for conversion of the facility to cannabis cultivation. Of that $25 million allowance, approximately $5 million relates to base building improvements, $8.7 million to electrical upgrades, $8.2 million to mechanical systems and a little over $3 million to plumbing and sprinklers. The interior of the building has been demolished and the new second floor has been installed, consisting of steel columns and decking and concrete deck topping. At completion, the facility is expected to have 14 flower rooms, 4 dry rooms, a mother room, clone room, trim room, packaging room, bedroom, and small head house space for employees and security. We have funded approximately $18 million of the $25 million and expect the remaining to be drawn over the coming months. Improvement disbursements have been made for design, permitting, interior demolition, material procurement due to long lead times and the construction of the

new steel structure and metal decking of the second floor. For the 19th Street project, as Ben mentioned, we acquired the land adjacent to our existing property and amended the existing lease with Kings Garden to incorporate that property and provide funding of up to $51.4 million for 2 brand-new industrial cultivation buildings expected to comprise 180,000 square feet. Together with the existing facility on the property, the completed site is expected to be 236,000 square feet and project costs are expected to be about $67.7 million, equating to about $287 per square foot. The site is currently being graded with anticipated pad certification for all buildings in a few months. Kings Garden, again, is procuring the long lead time items given the supply chain challenges of the current environment, including many of the same items requested for San Bernardino that I mentioned previously. At this point, we have funded approximately $27 million of the $51.4 million allowance for improvements. At completion, each building is expected to have 11 flower rooms, 4 dry rooms, a mother room, clone room, trim room, packaging room, bedroom and small head house space for employees and security.

208.    Despite already knowing at this time the allegations in the Report, Defendant Gold stated:

Again, very challenging to [convince] thoughts on underwriting the properties and market dynamics in the span of a few minutes and appreciate Ben's and Griffin's detail and effort to do so. We have been Kings Garden's partner for 3 years now and believe Michael King and his team have one of the best reputations for product quality and consistency and perhaps the single largest cannabis market in the world. While we are disappointed in how the California state and local governments have performed in the rollout and administration of the regulated adult-use cannabis program with continued heavy and even increasing tax burdens in certain jurisdictions and lack of enforcement for illicit activities by non-licensed operators, we believe Kings Garden has navigated this environment well. And our firm believers that high-quality producers like Kings Garden will continue to effectively adapt to the changing landscape in California. While we touched on just 2 of our tenants today, we apply a similar multifaceted approach to underwriting our tenants, the properties and the markets across our portfolio. I would also like to point out that it is our belief that our portfolio has a replacement cost that is well above our current basis, driven by the significant and continuing increases across the board in building costs that we are all experiencing. As one example among many, structural steel costs have increased by over 40% in just the last 15 months.

209.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    Kings Garden was a fraud and was not complying with the terms of its lease.

Having denied and dismissed the information in the Report, the Individual Defendants had three

weeks to investigate and to verify the truth about Kings Garden, but knowingly or recklessly failed to do so;

   (b) The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an ongoing basis" by reviewing publicly filed information, as claimed;

   (c) Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; and

   (d) Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

   210. On July 14, 2022, after the market closed, the Individual Defendants filed with the

SEC a Current Report on Form 8-K, disclosing:

> IIP-CA 2 LP ("Landlord"), an indirect, wholly owned subsidiary of Innovative Industrial Properties, Inc. (the "Company"), previously entered into leases (collectively, the "Leases") with Kings Garden Inc., as tenant ("Tenant"), for each of the six properties that Landlord owns.

> On July 13, 2022, Tenant defaulted on its obligations to pay base rent and property management fees for the month of July under each of the Leases, and defaulted on its obligations to reimburse Landlord for certain insurance premiums at the properties incurred by Landlord that are payable by Tenant as operating expenses under the Leases. Tenant's monetary default under all of the Leases was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest.

> The Company is continuing discussions with Tenant regarding the Leases, and has commenced discussions with other operators regarding potential re-leasing of certain of such properties.

211.    The foregoing was false and misleading because, for the reasons stated above, the Individual Defendants recklessly disregarded but were duty bound to disclose that:

(a)    Kings Garden was a fraud and was not complying with the terms of its lease. Having denied and dismissed the information in the Report, the Individual Defendants should have investigated and disclosed the truth about Kings Garden. Instead, they recklessly failed to disclose the truth;

(b)    The risks warned of had materialized. A simple investigation of public records revealed that King was, as the Individual Defendants described him, a "fraudster." In fact, from well before the start of the Relevant Period, King and Kings Garden had submitted material forged and fraudulent Draw Requests and invoices that the Individual Defendants did not verify. Kings Garden was stealing from IIPR. The Individual Defendants had not performed a "due diligence investigation[] of our potential tenants, related guarantors and their properties, operations and prospects," and had not "evaluated the credit quality of our tenants and any guarantors on an

ongoing basis" by reviewing publicly filed information, as claimed;

(c)     Upon disclosing the investments in Kings Garden, and its contribution to rental revenue, the Individual Defendants were duty bound to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices; and

(d)     Having discussed and praised Kings Garden, the Individual Defendants had a duty to disclose but omitted the full truth that King and Kings Garden were, in the Individual Defendants' words, "fraudsters," and that Kings Garden had already submitted material forged and fraudulent Draw Requests and invoices.

212.    In direct response to this news, IIPR's stock price fell by 14.3%, from a close of $111.61 on July 14, 2022, to a July 15, 2022 closing price of $95.70, damaging investors.

213.    On August 4, 2022, after the market closed, Defendants filed IIPR's Quarterly Report on Form 10-Q for the period ended June 30, 2022, disclosing the lawsuit the Company had filed against King Garden stating:

Kings Garden Lawsuit

On July 13, 2022, one of our tenants, Kings Garden Inc. ("Kings Garden"), defaulted on its obligations to pay base rent and property management fees for the month of July under each of its six leases with our indirect, wholly owned subsidiary, IIP-CA 2 LP, and defaulted on its obligations to reimburse us for certain insurance premiums at the properties incurred by us that are payable by Kings Garden as operating expenses under such leases. Kings Garden's monetary default under its leases with us was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management

fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest. We applied a portion of the security deposits under the leases, totaling approximately $2.3 million, as payment for these amounts, as well as applicable late charges and default interest through July 13, 2022. Of the six properties leased to Kings Garden, four were operational, with an expansion project at one of those properties, and the other two properties were in development or redevelopment as of June 30, 2022.

On July 25, 2022, IIP-CA 2 LP filed a lawsuit against Kings Garden. The case was named IIP-CA 2 LP, a Delaware limited partnership v. Kings Garden Inc., a Nevada corporation, CK Endeavors, Inc., a California corporation, and JM Endeavors, Inc., a California corporation, and was filed in the Superior Court of the State of California. The lawsuit asserts claims for breach of contract, declaratory relief, and injunctive relief. On August 2, 2022, the case was amended to be named IIP- CA 2 LP, a Delaware limited partnership v. Kings Garden Inc., a Nevada corporation, CK Endeavors, Inc., a California corporation, JM Endeavors, Inc., a California corporation, Michael King, an individual, Gary LaSalle, an individual, Charles Kieley, an individual, and Laurie Kibby, an individual, and *to include claims relating to construction at the expansion project and the property that was under redevelopment as of June 30, 2022 for breach of implied covenant of good faith and fair dealing, fraud, negligent misrepresentation, conversion, theft by false pretenses, money had and received, and violations of the Racketeer Influenced and Corrupt Organization Act (18 U.S.C. Section 1962(c))*. We are seeking monetary damages, interest, attorneys' fees, and declaratory and injunctive relief. Although there is at least a reasonable possibility that a loss may have been incurred in connection with the default by Kings Garden and the related construction projects, as of June 30, 2022, we are unable to make such an estimate.

***

Subsequent Events

Tenant Default

We previously entered into leases (collectively, the "Kings Garden Leases") with Kings Garden, as tenant, for six properties located in southern California. On July 13, 2022, Kings Garden defaulted on its obligations to pay base rent and property management fees for the month of July under each of the Kings Garden Leases, and defaulted on its obligations to reimburse us for certain insurance premiums at the properties incurred by us that are payable by Kings Garden as operating expenses under the Kings Garden Leases. Kings Garden's monetary default under all of the Kings Garden Leases was approximately $2.2 million in the aggregate, consisting of approximately $1.8 million of base rent and property management fees for the month of July and approximately $382,000 of insurance premiums, but excluding applicable late charges and default interest. We applied a portion of the security deposits under the Kings Garden Leases, totaling approximately $2.3 million, as payment for these amounts, as well as applicable late charges and default interest

through July 13, 2022. As of August 4, 2022, we had not received any additional payments from Kings Garden under any of the Kings Garden Leases, and have approximately $373,000 remaining of security deposits under the Kings Garden Leases.

214.    In direct response to this news, IIPR's stock price fell by 4%, from a close of $98.40 on August 4, 2022, to an August 5, 2022 closing price of $94.41, damaging investors.

## DAMAGES TO IIPR

215.    As a result of the Individual Defendants' improprieties, IIPR disseminated improper, public statements concerning the King, Kings Garden, IIPR's business condition, and future financial prospects. These improper statements have devastated IIPR's credibility.

216.    Additionally, as a direct and proximate result of the Individual Defendants' actions, IIPR has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action, in addition to the cost and expenses incurred in the lawsuit against Kings Garden.

217.    Finally, the Company also bears the burden of the funds paid to Kings Garden in connection with Kings Garden submitting fraudulent paperwork to IIPR.

## DERIVATIVE AND DEMAND ALLEGATIONS

218.    Plaintiff brings this action derivatively on behalf of IIPR to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duty alleged herein. IIPR is named as a nominal defendant solely in a derivative capacity.

219.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel experienced in derivative litigation.

220.    Plaintiff was a stockholder of IIPR at the time of the wrongdoing complained of,

has continuously been a stockholder since that time, and is a current IIPR stockholder. Prosecution

of this action, independent of the current Board of Directors, is in the best interests of the Company.

221.    The wrongful acts complained of herein were unlawfully concealed from IIPR's

stockholders.

222.    On December 23, 2022, Plaintiff made a demand on the Board to commence an

action against the Individual Defendants. *See* Exhibit A. The Demand and the allegations therein

are incorporated herein by reference.

223.    On January 30, 2023, counsel for the Board responded to the Demand by stating

the Demand is "moot" because, among other things, "the Company on its own identified concerns

with Kings Garden and took steps to investigate…" and cites to certain vague remedial measures

undertaken by the Company and the lawsuit filed against Kings Garden. *See* Exhibit B.

224.    Maryland law is clear that "as a general matter, once a shareholder demand is made,

"the corporation's board of directors ***must*** conduct an investigation into the allegations in the

demand and determine whether pursuing the demanded litigation is in the best interests of the

corporation." *Shenker v. Laureate Educ., Inc.,* 411 Md. 317, 983 A.2d 408, 423 (Md. 2009)

(Emphasis added).

225.    None of the contentions in the Company's response obviate the need of the

Company to investigate the claims contained in the Demand, as required by Maryland law. The

Board is not allowed to just refuse to investigate. The fact that the Company did a prior

investigation that led to the lawsuit and the eventual settlement with Kings Garden, does not void

the Board's responsibility from conducting its own, separate investigation into the alleged

misconduct by IIPR officers and directors as detailed in the Demand.

226.    Indeed, the investigation that the Board wholly relies upon was ***prior*** to the filing

of the related Securities Class Action that discusses at length multiple false and misleading statements that the Individual Defendants were involved in, and are also at the heart of the Demand, that have not been investigated.

227.     Moreover, the prior investigation undoubtedly focused on the fraud committed by Kings Garden and not the Individual Defendants' breaches of fiduciary duty outlined in the Demand and this Complaint.

228.     Accordingly, the Board's refusal to even consider the Demand amounts to a wrongful refusal.

### COUNT I
**AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY**

229.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

230.     The Individual Defendants owed and owe IIPR fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe IIPR the highest obligation of good faith, fair dealing, loyalty and due care.

231.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

232.     The Individual Defendants failed to properly oversee and investigate King and King's Garden, implement adequate internal controls over financial reporting, and made false and misleading statements, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

233.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, IIPR has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

234.    Plaintiff, on behalf of IIPR, has no adequate remedy at law.


**COUNT II**
**Violations of Section 14(a) of the Exchange Act**
**Against Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker**

235.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

236.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaim any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

237.    Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations at the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

238.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statements shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. §240.14a-9.

239.    Under the direction and watch of Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker, the Company's 2021 and 2022 Proxy Statements (the "Proxy Statements" or "Proxies") failed to disclose, *inter alia,* that they had not adequately investigated King and King's Garden putting the Company at material risk, and the Company failed to maintain adequate controls and oversight over its financial reporting to prevent such wrongful conduct, thus rendering the Proxy Statements false and misleading.

240.    In the exercise of reasonable care, Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker should have known that by misrepresenting or failing to disclose the forgoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to the Company's shareholders in voting on matters set forth for shareholder determination in the Proxy Statements, including the election of directors and the advisory approval of the executive compensation, as described herein.

241.    The Company was damaged as a result of Defendants Smithers, Gold, Kreitzer, Curran, Stecher, and Shoemaker's material misrepresentations and omissions in the Proxy Statements.

242.    Plaintiffs on behalf of IIPR have no adequate remedy at law.

WHEREFORE, Plaintiff demands for a judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of IIPR and that Plaintiff is a proper and adequate representative of the Company;

B.    Determining the Individual Defendants have breached their fiduciary duties and other violations of law;

C.      Awarding IIPR the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

D.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law, including, but not limited to the institution of appropriate corporate governance measures;

F.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

Dated: March 17, 2023                    Respectfully submitted,

By: _____/S/__ *Thomas J. Minton*_____
Thomas J. Minton – No. 03370
Goldman & Minton, P.C.
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Ph (410) 783-7575
Fax (410) 783-1711
tminton@charmcitylegal.com

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273

**LAW OFFICE OF**
**DEBRA S. GOODMAN P.C.**
Debra S. Goodman
1301 Skippack Pike, Suite7A#133
Blue Bell, PA 19422
Telephone: (610) 277 -6057
*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a jury trial.

Respectfully submitted,

By: _____/S/__ _Thomas J. Minton_____
Thomas J. Minton – No. 03370
Goldman & Minton, P.C.
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Ph (410) 783-7575
Fax (410) 783-1711
tminton@charmcitylegal.com

**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116
Facsimile: (484) 875-9273

**LAW OFFICE OF**
**DEBRA S. GOODMAN P.C.**
Debra S. Goodman
1301 Skippack Pike, Suite7A#133
Blue Bell, PA 19422
Telephone: (610) 277 -6057

***Counsel for Plaintiff***